*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

Nos. 03-6298/6406

LESLIE DELYNN CHAMBERS,

*Defendant-Appellee.*

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 02-20423—Jon Phipps McCalla, District Judge.

Argued: October 28, 2004

Decided and Filed: February 2, 2005

Before: MERRITT, DAUGHTREY, and SUTTON, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Thomas A. Colthurst, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. K. Jayaraman, Memphis, Tennessee, for Appellee. **ON BRIEF:** Thomas A. Colthurst, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. K. Jayaraman, Memphis, Tennessee, for Appellee.

MERRITT, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. SUTTON, J. (pp. 7-12), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

MERRITT, Circuit Judge. In this drug case, the District Court suppressed evidence of a methamphetamine laboratory seized by police officers as a result of a warrantless search of a trailer home and garage on a remote country road in a farming area of West Tennessee. The officers did not seek judicial review and approval in advance as the Fourth Amendment requires except in extraordinary circumstances. The government appeals the suppression order primarily on the ground that the possible destruction of evidence justified the warrantless search under the "exigent circumstances" exception to the warrant requirement. Secondarily, the government also claims as an alternative theory that the officers obtained a valid consent to search after their forced entry at the home. We will first set out the principles governing warrantless searches for evidence and then apply those principles to the situation before us. We will affirm the judgment of the District Court

1

because here there was no emergency justifying a warrantless search and the officers anticipated that they would conduct the search and could easily have obtained a search warrant.

## I. Principles Limiting Warrantless Searches Based on "Exigent Circumstances"

The principles governing warrantless searches based on "exigent circumstances" are fairly well settled.  In the Fourth Amendment, the Founders required a warrant for searches and seizures because they did not trust constables, sheriffs and other officers to decide for themselves when they had probable cause to search houses, individuals and places of business.  The first and most important principle is that searches must ordinarily be cleared in advance as a part of the judicial process.  In *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (footnotes omitted), the Supreme Court explained:

> Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . .that the exigencies of the situation *made that course imperative*."  "[T]he burden is on those seeking the exemption to show the need for it."

(Emphasis added and footnotes omitted.)  In order for a warrantless search to pass muster, probable cause must exist, but "no amount of probable cause can justify a warrantless seizure," *id.* at 471, because, in addition, the cause of the search must be based on an "emergency" and hence, "inadvertent" or unanticipated.  "Where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different." *Id.* at 470.

Under these principles, officers must seek a warrant based on probable cause when they believe in advance they will find contraband or evidence of a crime.  They must articulate the basis of their belief in the affidavit and bring the matter before a magistrate.  When the police go to a home with the intention of searching for evidence, they may not forgo a warrant.

When there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances.  In *McDonald v. United States*, 335 U.S. 451 (1948), "three police officers [without a warrant] surrounded the house" they had had under surveillance for two months where they believed that McDonald was conducting a numbers racketeering operation.  "While outside the house, one of the officers thought he heard an adding machine.  These machines are frequently used in the numbers operation.  Believing that the numbers game was in process, the officers sought admission to the house." *Id.* at 452.  They entered the home and seized the evidence while the numbers operation was in progress.  The Court suppressed the evidence:

> Where, as here, officers are *not responding to an emergency*, there must be compelling reasons to justify the absence of a search warrant . . . .  We will not assume that where a defendant has been under surveillance for months, no search warrant could have been obtained . . . .  No reason, except inconvenience of the officers and delay in preparing papers and getting before a magistrate, appears for the failure to seek a search warrant . . . .  *Absent some grave emergency*, the Fourth Amendment has interposed a magistrate between the citizen and the police.

*Id.* at 454-55 (emphasis added).  The "imperative" and "anticipated" language of *Coolidge* and the "grave emergency" language of *McDonald* are designed to insure that officers will seek a warrant based on probable cause when they have a belief in advance that they will find contraband or evidence of a crime.  They may only forego a warrant in the case of a true exigency or emergency.

Moreover, for a warrantless search to stand, law enforcement officers must be responding to an unanticipated exigency rather than simply creating the exigency for themselves. In *United States v. Richard*, 994 F.2d 244 (5th Cir. 1993), the officers were conducting surveillance of a hotel room occupied by suspects. The officers approached the door, knocked, and announced that they were police officers. The officers heard the sound of people talking softly, heard doors or drawers slamming, and footsteps moving about. The officer kicked the door open and entered the room without a warrant. Although officers claimed that they did not have probable cause to obtain a warrant in the beginning, the evidence suggested otherwise. *Id.* at 248. The court held that the officers could have secured the area around the room while they waited for a warrant; but because they did not, the officers had created the exigent circumstances that they wanted to rely on to justify their warrantless entry. A "warrantless entry became a foregone conclusion once officers knocked." *Id.* at 249-50. *McDonald* and *Richard* stand firmly for the proposition that warrantless searches are not permitted when the only exigency is one that is of the officer's creation.

Likewise, in *Ewolski v. City of Brunswick*, 287 F.3d 492, 504 (6th Cir. 2002), we reviewed a number of the "created-exigency" cases that apply the emergency and inadvertence principle which, we said, cannot be met "if the police controlled the timing of the encounter giving rise to the search." Our review concluded that "the created-exigency cases have typically required *some showing* of deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement." *Id.* (Emphasis added.)

## II. Application of "Exigent Circumstances" Principles to the Facts of this Case

The warrantless search in this case turned up extensive evidence of the operation of an elaborate meth laboratory that the police believed was at the premises when they arrived. At the suppression hearing below, the government offered evidence from the lead officer of the search, George Freeman, a narcotics officer for the Sheriff of Fayette County, Tennessee. He testified that four months before the search a known confidential informant advised police that the Chambers lab was manufacturing methamphetamine at the trailer home and garage where the search was later conducted. The informant's identity was known and his information was clear. There is no claim that the informant was anonymous, unreliable or had not given the officers a sound factual basis for his statements. Based on the strength of the information from the confidential informant, officers conducted both an extensive surveillance of the trailer home and garage from a nearby field for three nights and later used helicopter flyovers. The surveillance uncovered frequent nighttime visits to this remote location by numerous people in cars, some with out-of-county license plates — visits that Officer Freeman believed were consistent with customers purchasing drugs from the meth lab that the informant had described.[1] In addition, at the trailer home in this remote farming area, the

---

[1]Officer Freeman testified as follows:

Q:      Now I started this line of questioning by asking you if anything unusual happened, why was this activity significant to you?

A:      ....So with the vehicles coming up and down the road and stopping there for, you know, ten, 15, 20 minutes and then leaving, it seemed to be significant as far as in and out quick, frequent, which is consistent with narcotics activity.

. . . .

Q:      Why did you reach that conclusion?

A:      It's been my experience during narcotic investigations that a house where people pull up, either one or more occupants stay in the vehicle where the engine is left running and they go in the house for a short period of time and then leave, through — through my observations as a police officer that is consistent with narcotics sales.

officers observed that Chambers was using surveillance cameras and several high intensity spotlights to keep watch over the area — all of which fully corroborated the confidential informant's report to the police. There was now strong, indeed overwhelming, evidence of multiple drug sales at the premises on a daily basis, evidence supporting the informant's statements that a meth lab was in frequent operation at the Chambers home. But the officers took no action at this time to secure a search warrant despite the incriminating evidence in their possession. No magistrate was asked nor has any magistrate ever turned down a request for a warrant in this case.

At the suppression hearing, narcotics Officer Freeman also testified that the sheriff's office then received an "anonymous" call on October 9, 2002, three months after the surveillance. Freeman said that the caller "was adamant that I write this down and stated that the Chambers were cooking meth right there on Linwood road right now and that we had better get out there, and hung up the phone." The police now had evidence from a known confidential informant, the strong corroboration obtained as a result of their extensive surveillance and evidence from an anonymous caller that the drug was being manufactured at the Chambers lab that day. Still the officers did not seek a warrant.

Instead, the officers performed a warrantless "knock and talk investigative technique" that Officer Freeman had been taught, a method of investigation requiring the officer to go to a home and knock on the door and ask questions in an effort to gain consent to search.[2] While en route to the Chambers' home, Freeman called Officer Feathers of the federal DEA task force to advise him to be ready for a search at the Chambers residence. Three cars with armed deputies drove to the house to participate in this so-called "consensual" encounter.

They knocked on a glass entry door of the trailer home. A woman came to the glass door to answer the knock. She retreated when she saw that the police were at the door. She called out that there were police at the door; and the police heard, according to Officer Freeman, footsteps scurrying inside the trailer as the woman went into another room. Freeman then used the knock and the occupant's refusal to talk as the justification for entry. The police officers immediately went through the door with guns drawn and into the trailer home to begin their search. The officers had now entered the home without a warrant after appearing in three cars and after informing the DEA task force of the impending search. Why and how exactly the officers thought that the occupants were going to destroy an entire operating meth laboratory with heavy equipment and drums of chemicals in two detached buildings is not explained.

After searching for a few minutes and finding incriminating evidence, indicating an operating meth lab, Officer Freeman read Chambers, the owner, and his wife, their Miranda rights; and the Chambers then signed a consent to search form at the request of officer Freeman. Freeman testified that Chambers was under arrest and not free to leave.

After the entry and search, Freeman called Feathers back and asked him to come. Feathers came to the premises with other officers and told Freeman that with the "information that they . . . had prior on Mr. Chambers, they [the Feathers group of officers] just wanted to go ahead and stop . . . and get a search warrant." Freeman had not suggested a warrant. Unlike the sheriff's officers, these DEA officers believed a warrant necessary based on the "prior information" they had about the Chambers. They would not participate in a search based on exigent circumstances. So at that

---

Testimony of George Freeman, Suppression Hearing, Feb. 26, 2003, at pp. 23-24 (J.A. at 166-67).

[2]"Courts have defined [knock and talk] as 'a noncustodial procedure [in which] the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence.'" *United States v. Hardeman*, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999) (citation omitted). Courts generally have upheld this investigative procedure as a legitimate effort to obtain a suspect's consent to search.

point the various officers on the premises waited for the search warrant to arrive, long after the initial search had actually been conducted after the warrantless entry.

The government's claim that the officers did not have sufficient evidence of probable cause even to seek a warrant is more farfetched than the similar claim that the Supreme Court rejected in *McDonald*. Like the Court in *McDonald*, "[w]e will not assume that where a defendant has been under surveillance for months, no search warrant could have been obtained." 335 U.S. at 454-55. The officers had the information from the confidential informant, the corroboration gained by their extensive surveillance and the anonymous caller evidence. They had advised the DEA in advance of the impending search. Clearly, they should have sought a search warrant. Moreover, they completely "controlled the timing of the encounter giving rise to the search." The fact that the woman at the door called out "police" and retreated back to another room does not create an exigent circumstance. It is her constitutional right. Such a retreat and refusal to allow soldiers or armed officers into the home is every citizen's right under the Fourth Amendment, the very reason for its creation. The exercise of this fundamental right against armed invasion of the home is certainly not, as the government seems to imply, the "equivalent" to yelling "destroy the drugs" — or "get your guns ready" or "try to hide or destroy the boiler and all the lab equipment." The exercise of a constitutional right at the front door of your home not to consent to talk or allow a search does not create an exigency justifying a warrantless entry.

"The burden is on those seeking the exemption [from the warrant requirement] to show the need for it," *Coolidge*, 403 U.S. at 455. There is no showing here at all that a magistrate would not have issued the warrant earlier in the day or at some previous time, as he did later in the day upon the affidavit of the DEA Task Force. There was no exigency. We therefore conclude that the District Court did not err in its conclusion that the government has failed to show the need for an exemption from the warrant requirement of the Fourth Amendment.

The failure to seek a warrant in the face of plentiful probable cause, the timing and Freeman's call to Officer Feathers advising him of the impending search, as well as the arrival with three cars and the immediate entry with guns drawn, taken together, meet the requirement of "some showing of deliberate conduct on the part of the police evincing an effort to evade the warrant requirement." Even were the Court to find exigent circumstances, the record indicates that any exigency was calculated by the police in order to facilitate their warrantless search.

The freedom from armed intrusions of the home "outside the judicial process, without prior approval by judge or magistrate," as the Supreme Court explained in the *Coolidge* case quoted above, is one of our most "basic" civil liberties. Like the rights of free speech and assembly, trial by jury and the right to counsel, it is among the civil liberties the founding generation fought for and included in our founding documents — a liberty that the American people have pointed to with pride for 200 years. We should continue to take seriously the rule that judicial review is necessary to allow such intrusions and not water down the warrant requirement because advanced judicial clearance is an inconvenient or inefficient practice that the police or the military are too busy, or otherwise unwilling, to observe.

### III.  The Consent to Search Issue

Within a few minutes after the warrantless entry, Officer Freeman encountered Chambers, effectively advised him that the officers had looked around briefly and found evidence of methamphetamine use and manufacture, read him his *Miranda* rights and asked him to sign a consent to search further. Officer Freeman answered, "Yes" to the question on cross-examination, "[Chambers] was actually detained, is that correct, he is not free to leave at the time he was asked for the consent to search?" At that point, after the illegal entry and after the officers had found some

evidence of the methamphetamine lab they had expected to find, and after Chambers was not free to leave, Chambers and his wife then signed a consent to search form.

The government's brief correctly states the standard for consent to search after an illegal entry:

> When an individual consents to a search after an illegal entry is made, the consent is not valid and "suppression is required of any items seized during the search..., unless the taint of the initial entry has been dissipated before the 'consents' to search were given." *Buchanan*, 904 F.2d at 356 (quoting *United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980), *cert. denied*, 450 U.S. 970 (1981)). "Dissipation of the taint resulting from an illegal entry," this Court has held, "ordinarily involves showing that there was some significant intervening time, space, or event." *Id*. (quoting *Vasquez*, 638 F.2d at 528). Finally, it is the government's burden to show that the defendant's consent "was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion." *Buchanan*, 904 F.2d at 356 (emphasis in original).

We agree with the District Court that the consent to search forms were executed by Chambers and his wife only a few minutes after the illegal entry by three police officers, after they had conducted a brief preliminary search and found evidence of a methamphetamine lab and after Chambers was no longer free to leave and therefore effectively under arrest. We agree with the District Court as well that these events created a highly coercive atmosphere and that "it would be reasonable for Chambers to think that refusing consent would be a futile gesture amounting to no more than 'closing the barn door after the horse is out.'" The District Court credited Chambers' testimony: "He asked me if I had the keys to the shed [where the anhydrous was stored], and he had me under arrest, I didn't know what else to do . . . I had no choice in it." (Op., p. 23, App. 107.) Based upon the evidence in the case, we find no error in these findings and the conclusion of the District Court as follows:

> Considering the totality of the circumstances, the Court finds that Chambers' consent was the product of the prior illegal entry into his residence. Accordingly, it is submitted that the government has not carried its burden to show by a preponderance of the evidence through clear and positive testimony that Chambers' consent was voluntary.

(Op. p. 24, App. p. 108.)

Accordingly, the judgment of the District Court is AFFIRMED.

———————————

**DISSENT**

———————————

SUTTON, Circuit Judge, dissenting.  As this matter comes to the court, the debate over the officers' initial entry into the house has focused on two questions:  whether the officers had probable cause to search the house and whether the exigent-circumstances exception allowed them to enter the house in the absence of a warrant.  The majority acknowledges that probable cause existed to conduct a search, a conclusion with which I agree, and suggests that exigent circumstances did not exist, a conclusion with which I do not agree—given that the police suspected that drugs and a drug-manufacturing operation were in the house, one of the occupants yelled "the police are here" upon answering the police officer's knock on the door, this same occupant "ran" back into the house after seeing who was there and other occupants of the house began moving quickly after hearing that the police had arrived.  Rather than stop there, however, the majority proceeds to invalidate the search primarily on the ground that the officers manufactured the exigency, a ground neither argued by the defendant nor supported by the facts.  Because the manufactured-exigency exception requires "deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement," *Ewolski v. City of Brunswick*, 287 F.3d 492, 504 (6th Cir. 2002), and because no such conduct occurred here, I respectfully disagree with this conclusion as well.  I thus would uphold the initial search and, after that, the full search to which the defendant freely consented after the officers' initial and permissible entry.

First, was there probable cause?  Under the "flexible, common-sense standard" of probable cause, *Texas v. Brown*, 460 U.S. 730, 742 (1983), probable cause exists when "the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime," *id.* (internal quotations marks and citation omitted), or when there is "a fair probability that contraband or evidence of a crime [would] be found in a particular place," *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The officers satisfied this standard.

In June of 2002, a confidential informant told the police that methamphetamine was being manufactured at the Chambers' house.  Surveillance corroborated the tip, revealing an elaborate security system beyond that of a typical rural homeowner:  motion detectors, floodlights, surveillance cameras and a person acting as a lookout.  Add to these observations a series of short-duration visits made by different people to this rural house late at night in June, all observed by Freeman, and it is not surprising that Freeman came to the conclusion that "narcotics activity" was afoot.  JA 166.  Yet because Freeman did not believe he had enough facts at that time to support probable cause, he did not seek a warrant to search the house or, for reasons that remain unclear, conduct any other surveillance of the house.  *See* JA 199 (Freeman testifying that he did not believe he had probable cause prior to the knock-and-talk encounter).

Roughly four months after the surveillance ended, on October 9, the police received an anonymous call about the Chambers' house.  "I'm not going to give you my name," the caller said, "but they're cooking meth on Linwood, the third or fourth house on the left, the Chambers' residence, and you need to get down there quick before somebody gets hurt."  JA 243.  Immediately after receiving the tip, several officers drove to the Chambers' home and proceeded to conduct what has come to be known as a "knock and talk" consensual encounter.  They knocked on the door, which was answered by a woman.  Upon answering the door, she "ran back into the trailer home out of sight, very excited and loudly shouting, 'The police are here.'"  JA 91 (magistrate judge's findings of fact, later adopted by district court).  At the same time, the officers heard the sound of several other occupants suddenly moving quickly within the house.

All of these factors considered—two tips (one by a confidential informant, the other anonymous), the surveillance of the house four months earlier and on the day of the search, and the reaction of the woman and the other occupants upon the arrival of the police—the police had probable cause to believe that criminal activity was taking place in the house on October 9. *See Gates*, 462 U.S. at 238 (explaining that probable cause exists when there is "a fair probability that contraband or evidence of a crime [would] be found in a particular place"); *United States v. Velazquez-Rivera*, 366 F.3d 661, 664 (8th Cir. 2004) (efforts at flight and evasion combined with corroborated informant's tip established probable cause); *United States v. Clarence Pennington*, 328 F.3d 215, 221 (6th Cir. 2003) (noting that the "sound of footsteps, indicating someone running away from the front door . . . would indicate to a reasonable officer that . . . the person inside the home was taking some type of evasive action, including the possible destruction of contraband"); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[H]eadlong flight . . . is the consummate act of evasion.").

Chambers attempts to counter this conclusion by arguing that the events in June were too remote in time to be factored into the probable-cause equation. Yet staleness is not measured "solely by counting the days on a calendar." *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998). It turns on a host of "variables: the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), *etc.*" *Id.* (quotation marks omitted). The old and new evidence in this instance both pointed in the same direction, namely toward the existence of an ongoing methamphetamine laboratory at the Chambers' house. The two tips, separated by four months, each attested that there was a methamphetamine laboratory there; the elaborate home security measures suggested a fixed and ongoing operation; the presence of an unusual number of automobiles at a dead-end road in a rural location with normally sparse traffic suggested an ongoing criminal operation; and the reaction of the woman at the door confirmed that the prior apparent drug activity at the house had become the prologue to current drug activity at the house. As these variables demonstrate, even when a significant period of time has elapsed since a defendant's last reported criminal activity, it is still possible to infer that wrongdoing continues on the premises. *Id.*; *see also United States v. Wright*, 343 F.3d 849, 864 (6th Cir. 2003) (a factor for evaluating staleness is whether there is "any corroboration of the older and more recent information"); *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972) (when facts indicate "activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant"). A person of reasonable caution, in short, could well have expected to find methamphetamine and the equipment used to make it at the Chambers' house on October 9.

Second, did exigent circumstances allow the police to enter the house without a warrant? The police, the parties agree, may conduct a warrantless search when probable cause exists and when they face exigent circumstances, *see Groh v. Ramirez*, 540 U.S. 551, 559 (2004), which include the risk that evidence of criminal activity will be destroyed, *see Coolidge v. New Hampshire*, 403 U.S. 443, 477–78 (1971) (noting "the basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined 'exigent circumstances'" and then discussing the destruction of evidence). The police, the parties further agree, may enter a house without a warrant (as well as execute a search warrant without knocking and announcing) when "probable cause plus exigent circumstances" exist. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (explaining that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home"); *United States v. Campbell*, 261 F.3d 628, 632–33 (6th Cir. 2001) ("The law is well settled that a warrantless entry will be upheld when the circumstances then extant were such as to lead a person of reasonable caution to conclude that such evidence would probably be destroyed within the time necessary to obtain a search warrant."). *See also United States v. Douglas Pennington*, 287 F.3d 739, 747 (8th Cir. 2002) (holding that officer's knowledge that drugs had just

left the house, that drugs had been found in the residence during a search three months prior, and that the house currently smelled of drugs "created exigent circumstances justifying the officers' entry into the house to arrest [an occupant] and to prevent the destruction of drug manufacturing evidence while they obtained a search warrant"); *United States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998) (holding that the warrantless entry into the suspect's home was justified because the officers reasonably believed the occupant was aware of their presence and preparing to destroy evidence). And the police, the parties finally agree, not only may use consensual encounters on the street as a legitimate law-enforcement technique, but they also may use consensual encounters at a doorstep—a "knock and talk"—as a legitimate investigative technique. *See United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *see also Ewolski*, 287 F.3d at 504 (concluding that it was reasonable to approach a suspect's home to attempt to learn more through consensual questioning).

Given these principles, all agree, including defense counsel at oral argument, that the validity of this search would have been a lay-down if the woman answered the knock on the door by yelling "Police, destroy the drugs." That response to a legitimate knock on the door by the police assuredly would have removed any doubt about probable cause while at the same time establishing the requisite exigent circumstances to enter the house and preserve the status quo before obtaining a warrant or consent to search. Under these circumstances, the question in *this* case comes to this: Is what the police saw and heard sufficiently akin to yelling "Police, destroy the drugs" as to justify the officers' actions? I think it is.

For one, while the woman did not yell "Police, destroy the drugs," she did yell "the police are here" and ran down the hallway after answering the door. That is not the way law-abiding citizens generally react to an encounter with the police. *See Clarence Pennington*, 328 F.3d at 221 (noting that an occupant who runs away from the door when police knock is acting suspiciously); *cf. Illinois v. Lidster*, 540 U.S. 419, 425 (2004) ("[C]itizens will often react positively when police simply ask for their help as responsible citizens to give whatever information they may have to aid in law enforcement.") (quotation marks and brackets omitted). For another, what happened immediately after the woman's reaction to the presence of the police amounted to the visual and aural equivalent of "destroy the drugs." The woman "ran" down the hallway away from the door and the officers heard "the sound of people running inside the trailer." JA 174. At this point, of course, the officers did not conduct a full-blown search of the house, but entered the house to preserve the status quo. And had the Chambers not eventually consented to the search, there is every indication that the group of officers engaged in the investigation would have proceeded to obtain a search warrant for the house. JA 185 (testifying in response to the question "did you search the house after receiving consent?," Freeman said, "No, sir, we—we waited" for the DEA agents to arrive); JA 196 (recording that when the DEA agents arrived and learned of the evidence initially observed, they stopped and waited for a search warrant).

In view of the reaction of the woman and the other individuals in the house to the arrival of the police and in view of the reality that there was probable cause that drugs and drug-manufacturing equipment were in the house, exigent circumstances existed to enter the house promptly to control the situation. Time and again, courts have recognized that because drugs (and, it follows, the raw materials used to make them) are eminently disposable, exigent circumstances will often exist to enter a house without knocking and announcing or, as here, without a warrant. *See, e.g.*, *United States v. Banks*, 540 U.S. 31, 39 (2003) (noting that prudent cocaine dealers keep their drugs near a commode or sink for quick disposal in the course of ruling on the appropriate amount of time officers must wait to enter a house after knocking on the door); *United States v. Elkins*, 300 F.3d 638, 655 (6th Cir. 2002) ("Exigent circumstances permitting police to enter a structure without a

warrant may arise when evidence of drug crimes is in danger of destruction.”); *see also Campbell*, 261 F.3d at 632–33 (same).

Third, does the manufactured-exigency exception (to the exigent-circumstances exception to the warrant requirement) alter this conclusion? In the majority’s view, it does; in my view, it does not.

Recognizing the need to give the police reasonable latitude in doing their job, our “created-exigency cases have typically required some showing of *deliberate conduct* on the part of the police evincing an effort intentionally to evade the warrant requirement.” *Ewolski*, 287 F.3d at 504 (emphasis added). In *Ewolski*, police received credible evidence that an individual was dangerous and volatile and might be a risk to his wife and son. In the course of rejecting an argument that the officers’ warrantless entry into the house grew out of a manufactured exigency, *Ewolski* explained what happens when police go to a home to “attempt to learn more through consensual questioning.” *Id.* “When an officer observes facts giving rise to exigent circumstances in the course of [ ] a consensual encounter,” we held, “it usually cannot be said that the officer impermissibly ‘created’ the exigent circumstances.” *Id.* at 505.

Just as facts observed by the police in the course of a consensual encounter “usually” will not be treated as deliberately prompting an exigency, so it is true that facts gathered in the course of other ordinary police work typically will not be treated as contriving an exigency. In *Campbell*, members of a police narcotics unit intercepted a Federal Express package containing drugs. Seeking to catch the intended recipient of the package, the officers removed most of the drugs (replacing them with another substance), inserted a transmitting device that would activate upon opening the package and obtained a warrant to search the addressed residence. *Campbell*, 261 F.3d at 629–30. Undercover officers monitored the delivery of the package, but the suspect defied their expectations by taking the package to a different residence. *Id.* at 630. Soon after the suspect arrived at the second residence, the transmitter signaled that the suspect had opened the package, after which officers entered the residence without a warrant to prevent the destruction of evidence. *Id.* On appeal from the conviction of the suspect, we rejected his claim that the police manufactured the exigency, emphasizing that it was the actions of others, not the actions of the police, that established the exigency. *Id.* at 634.

So it is here. On October 9, the police received an anonymous tip that methamphetamine was being “cooked” at the Chambers’ residence and that “you need to get down there quick before somebody gets hurt.” *See* JA 210 (Freeman describing methamphetamine labs as “very explosive”), 243. At that point, the officers did not believe that they had probable cause sufficient to support a search warrant, *see* JA 199 (Freeman testifying that he did not believe he had probable cause prior to the knock-and-talk encounter), and at all events could fairly believe that they did not have time to try to get a warrant given the nature of the tip. The only deliberate conduct of the police under these circumstances was to use a reasonable investigative tool—the consensual encounter—to gather more evidence and to do so quickly. When the residents of the house responded to this legitimate law-enforcement technique in incriminating and risky ways—by yelling “Police” and running back into the house in one instance and by moving suddenly and quickly around the house in other instances—it was the residents, not the police, who created the danger that evidence of drug activity would soon disappear. As *Ewolski* makes clear, “[w]hen an officer observes facts giving rise to exigent circumstances in the course of such a consensual encounter, it usually cannot be said that the officer impermissibly ‘created’ the exigent circumstances.” 287 F.3d at 505. All of this may explain why Chambers did not rely on the manufactured-exigency exception below or in the court of appeals.

While the majority gives several explanations for applying the manufactured-exigency exception here, I do not find them convincing. The one case cited by the majority in which a

manufactured exigency was found, *United States v. Richard*, 994 F.2d 244 (5th Cir. 1993), does not cover our circumstances. There, police suspected a man of drug smuggling, knocked on his door and announced that they were police officers. When the occupants responded, "Okay. Okay. Wait a minute," but did not open the door quickly, the police forced themselves into the hotel room. *Id.* at 246–47. Noting that the officers did not have a warrant and did not have probable cause of illegal activity before they entered the room and that the officers "did not know what, if any, evidence [the hotel room] might contain," the Fifth Circuit understandably did not accept the government's claim that "the possibility of destruction of evidence" provided an exigent circumstance. *Id.* at 249. I agree with the resolution of *Richard* but not its application here. In *Richard*, unlike our case, the police did not have probable cause of drug activity before entering the hotel room. And in *Richard*, unlike our case, the residents did nothing unusual or incriminating in answering the door that would have created probable cause or a drug-offense-related exigency.

While the majority relies on language in *Coolidge* for the proposition that the discovery of evidence must be "inadvertent" or "unanticipated" to justify a warrantless entry, the inadvertence requirement, as the majority's citations demonstrate, *see ante* at 2, applies to the plain-view exception, not the destruction-of-evidence exception, *see Coolidge*, 403 U.S. at 469, 471 (stating that "the discovery of evidence in plain view must be inadvertent" and that an intrusion to seize "objects—not contraband nor stolen nor dangerous in themselves—which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure"). Removing any doubt on this score, the Supreme Court more recently has held that "even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition." *Horton v. California*, 496 U.S. 128, 130 (1990).

Nor do I see how *McDonald v. United States*, 335 U.S. 451 (1948), advances the majority's analysis. *McDonald* suppressed evidence found during a warrantless search because exigent circumstances did not justify the entry. "[T]he defendant," the Court observed, "was not fleeing or seeking to escape. Officers were there to apprehend petitioners in case they tried to leave. Nor was the property in the process of destruction nor as likely to be destroyed as the opium in the *Johnson* case." *Id.* at 455. Since the police went promptly to the house in response to a tip that "you need to get down there quick before somebody gets hurt" and proceeded to act in response to the likely destruction of evidence, *McDonald* reinforces the propriety of the officers' actions.

Nor can I agree with the majority that because some meth lab components cannot be quickly destroyed the police faced no threat of evidence destruction. Certainly the most incriminating evidence, the methamphetamine itself, could be quickly flushed or otherwise destroyed. As the indictment shows, destroying the methamphetamine would reduce the seriousness of the offenses considerably. *Compare* JA 11 (listing count one, manufacturing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1), as including a 20-year maximum sentence) *with* JA 13 (listing count three, possessing materials which could be used to manufacture a controlled substance in violation of 21 U.S.C. § 843(a)(6), as carrying a 10-year maximum sentence). Nothing about the exigent-circumstances exception requires the police to wait patiently outside because the suspects could destroy only some, but not all, of the evidence.

Neither can I agree that the potential existence of probable cause *before* the knock and announce proves that the officers contrived this exigency. While there may be reasons to criticize law-enforcement reticence in responding to evidence of criminal activity and while there may be reasons to criticize law enforcement for failing to appreciate that they have probable cause that criminal activity is afoot, I should not think the Fourth Amendment is one of them. It is far from self evident that a restrained attitude toward the quantum of evidence needed to establish probable cause is a police failing. Moreover, making the manufactured-exigency exception applicable whenever courts (though not the police) conclude that probable cause existed before the encounter

would create a peculiar rule in which searches could be invalidated either because the police did not have probable cause or because they did.

Nor do I agree with the majority's other explanations for finding a manufactured exigency—the decision to go to the Chambers' house after receiving the anonymous tip rather than seeking a warrant, the call to the DEA agent before arriving at the Chambers' house and the number of police that went to the house. The officers' decision not to seek a warrant after the anonymous tip on October 9 was no less likely a result of the tipper's concern that "you need to get down there quick before somebody gets hurt" than it was to gin up an exigent circumstance. *See* JA 210 (Freeman describing methamphetamine labs as "very explosive"). The decision to tell the DEA agent that there would likely be a search later that day at the Chambers' house was sensible as well. In light of the tip, the trip to the Chambers' house could well have led to sufficient evidence of probable cause and consent to search or to the request for a warrant. Either way, the services of an expert on methamphetamine laboratories might well be needed. And the number of officers that went to the house had no impact on the exigency that arose and was again a sensible response to what was plainly a serious investigation.

Despite my disagreement with the majority, I am not unmindful of the risk here—the potential of undermining the warrant requirement and of doing so where it is needed most, the home. Yet the traditional rules governing the exigent-circumstances exception, not the alteration of the test, ought to address this concern. Police, for example, may not cry exigent circumstances whenever probable cause exists that readily disposable drugs are in the home—no matter what the response of the resident happens to be. Otherwise, all knock-and-talk encounters would generate the exigency merely by the appearance of the officers. For my part, the question remains whether the resident's reaction is the verbal, visual or aural equivalent of "The police are here, destroy the drugs." Here it was. In most cases, it presumably will not be. *See United States v. Renfro*, 620 F.2d 569, 575 (6th Cir. 1980) ("The government is not relying on the defendant's knowledge of the police presence alone as creating the exigent circumstances justifying the warrantless entry. [The defendants'] actions in attempting to destroy evidence were a sudden intervening development which changed the complexion of the entire incident and necessitated immediate action.").

Nor will a ruling for the government in this case lead officers customarily to avoid seeking a warrant (even when they already have probable cause) on the theory that the residents will react to their presence in a way that creates an exigency. That is a gamble no sensible officer would take—unless, as here, the officers were told to go to the house immediately because "somebody" is going to "get[] hurt." When no one answers the door (even if the residents are home), when no one at the home is willing to talk about the matter or when no one at the home does anything incriminating, the investigation will have reached a conspicuously low point. The officers will have to leave, and the drug manufacturer will have the kind of warning that even the most elaborate security system cannot provide.

For these reasons, I respectfully dissent.