Estill PERKINS, Jr., Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2006–CA–000934–MR.

Court of Appeals of Kentucky.

Oct. 5, 2007.

Jeremy R. Morgan, Hazard, KY, for appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Matthew R. Krygiel, Assistant Attorney General, Frankfort, KY, for appellee.

Before COMBS, Chief Judge; ACREE, Judge; HENRY,[1] Senior Judge.

*OPINION*

COMBS, Chief Judge.

Following a trial in the Knott Circuit Court, a jury found Estill Perkins, Jr., guilty of a number of drug-related offenses. The court sentenced him to five years' imprisonment. He appeals that judgment. After our review, we affirm.

On February 16, 2004, at approximately 7:34 p.m., the Kentucky State Police (KSP) received an anonymous call from a woman who alleged that Perkins had stashed a large amount of cocaine, marijuana, and pills under his bed in the back bedroom of his house. She also indicated that she had been to Perkins's residence and had seen him cutting a block of cocaine on a coffee table in the living room. The KSP had previously received other complaints regarding Perkins.

At approximately 8:30 p.m, KSP officers Richard Miller, Jody Sims, and David Banks went to Perkins's house to conduct a "knock and talk" visit. The officers knocked on the door and were greeted by Perkins's son, Malcolm, who appeared to be fifteen or sixteen years of age. Malcolm was in the living room/kitchen area playing with a remote-controlled car. When Miller asked Malcolm where his father was, Malcolm replied that he was in his bedroom. Miller then asked Malcolm if he minded if they talked to his father. Not only did Malcolm not object, but he invited the officers to enter and then directed them towards Perkins's bedroom. The door to the bedroom was open, and the officers found Perkins sitting on his bed eating a sandwich. Perkins told the officers to "come on in, boys."

Miller said hello to Perkins, introduced himself, and told Perkins that they had received a complaint regarding drug activity at his house. Perkins told them that he had stopped selling drugs. Baker saw a baggie lying near the bed, which he suspected to contain marijuana residue. Miller asked Perkins to give them any drugs that he possessed. Miller stated that if Perkins would be honest with them, he would not be arrested immediately and instead would be indicted later. Perkins

---

1. Senior Judge Michael L. Henry sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

agreed that he would give them what he had. He reached into his pocket and pulled out a baggie that appeared to contain cocaine. He said that the baggie's contents were for his personal use only.

Miller then asked Perkins for permission to search his house, and Perkins consented. Miller noticed a safe in the bedroom; Perkins said that it contained money and documents. Perkins produced a key and opened the safe, which contained $9,000.00, another baggie containing cocaine, some pills, and a set of scales. Because Perkins was cooperative, the officers refrained from searching the rest of the house and did not arrest him as they had promised.

More than six months later, on September 3, 2004, the Knott County Grand Jury indicted Perkins on one count of first-degree possession of a controlled substance, a Class D felony pursuant to Kentucky Revised Statutes (KRS) 218A.1415; one count of possession of drug paraphernalia, first offense, a Class A misdemeanor pursuant to KRS 218A.500(2); one count of third-degree possession of a controlled substance, a Class A misdemeanor pursuant to KRS 218A.1417; and one count of possession of marijuana, a Class A misdemeanor pursuant to KRS 218A.1422. On October 28, 2004, Perkins appeared in court with counsel and entered a plea of not guilty to the charges set forth in the indictment. On September 6, 2005, the grand jury issued a superseding indictment charging Perkins on one count of first-degree trafficking in a controlled substance, a Class C felony pursuant to KRS 218A.1412, and another count of third-degree possession of a controlled substance. The first-degree and third-degree possession charges in the original indictment were dismissed later by agreement, and the remaining counts were consolidated.

Following a jury trial held on January 10 and 11, 2006, Perkins was found guilty of first-degree possession of a controlled substance (a lesser-included offense of the trafficking count), third-degree possession of a controlled substance, possession of drug paraphernalia, and possession of marijuana. On March 15, 2006, the trial court entered a judgment consistent with the jury's verdict and sentenced Perkins to a prison sentence totaling five years. Perkins's post-trial motions were denied. This appeal followed.

Perkins first argues that the trial court erred by denying his motion to suppress all evidence resulting from the KSP's knock and talk and from the subsequent warrantless search at his residence.

An appellate court's standard of review of the trial court's decision on a motion to suppress requires that we first determine whether the trial court's findings of fact are supported by substantial evidence. If they are, then they are conclusive. Based on those findings of fact, we must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law. *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky.App.2002). In conducting our review, our proper role is to review findings of fact only for clear error while giving due deference to the inferences drawn from those facts by the trial judge. *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky. 2002), quoting *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). After reviewing the record, we conclude that the trial court's findings of fact were indeed supported by substantial evidence. Accordingly, our attention is focused solely upon "whether the rule of law as applied to the established facts is or is not violated." *Adcock v.*

*Commonwealth,* 967 S.W.2d 6, 8 (Ky.1998), quoting *Ornelas,* 517 U.S. at 697, 116 S.Ct. at 1662.

Following a suppression hearing conducted on May 12, 2005, the trial court entered findings of fact and conclusions of law denying Perkins's motion to suppress the evidence taken from his house. The court found that the consent of his son, Malcolm, to enter the house was made voluntarily and that it was reasonable for the officers to believe that Malcolm had the apparent authority to consent to their entry into the residence. The court also found that Perkins voluntarily admitted to the officers that he possessed illegal substances and that he then voluntarily consented to a search of his person and of his bedroom.

■■■ The Fourth Amendment of the United States Constitution generally prohibits warrantless entry into a person's home. However, an exception to the warrant requirement exists if valid consent has been obtained from a third party, generally one who shares common authority over the premises to be searched.

> [D]etermination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?

*Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990), quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). In analyzing the validity of a third-party consent, we must determine whether a police officer could reasonably believe from the context involved that the consenting party had common authority over the premises. *Commonwealth v. Nourse,* 177 S.W.3d 691, 696 (Ky.2005). Good faith on the part of the officers may

serve as a hedge against honest mistake as to appearances.

> The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Rodriguez,* 497 U.S. at 186, 110 S.Ct. at 2800.

Many courts—including our own federal Sixth Circuit—have recognized the legitimacy of knock-and-talk encounters at the home of a suspect or another person who is believed to possess information about an investigation. *United States v. Thomas,* 430 F.3d 274, 277 (6th Cir.2005). The presumption of propriety in knock-and-search visits was well summarized by the Ninth Circuit Court of Appeals in *Davis v. United States,* 327 F.2d 301 (9th Cir.1964):

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

*Id.* at 303. We agree that there is nothing inherently unconstitutional or even inappropriate about the use of the knock-and-talk technique as an investigatory tool. Nonetheless, knock-and-talk encounters inevitably imply constitutional ramifications. As the Michigan Court of Appeals aptly stated:

Anytime the police initiate a procedure, whether by search warrant or otherwise, the particular circumstances are subject to judicial review to ensure compliance with general constitutional protections. Accordingly, what happens within the context of a knock and talk contact and any resulting search is certainly subject to judicial review. For example, a person's Fourth Amendment right to be free of unreasonable searches and seizures may be implicated where a person, under particular circumstances, does not feel free to leave or **where consent to search is coerced.** Thus, whenever the procedure is utilized, ordinary rules that govern police conduct must be applied to the circumstances of the particular case. Consequently, we review the circumstances of this case against general protections guaranteed by the constitution. (Emphasis added.)

*People v. Frohriep,* 247 Mich.App. 692, 637 N.W.2d 562, 566–67 (2001). The validity of the third-party consent is critical to a determination of the constitutionality of the entry by the police.

Perkins contends that the officers improperly entered his home based upon the permission of his minor son, who appeared to the officers as being fifteen or sixteen years of age. However, numerous courts have held that a high-school-aged child may be presumed to have at least some authority to allow entry into a home. *See, e.g., Doyle v. State,* 633 P.2d 306, 309 (Alaska Ct.App.1981); *People v. Hoxter,* 89 Cal.Rptr.2d 259, 264–65, 75 Cal.App.4th 406, 412–13 (Cal.Ct.App.1999).

The facts of this case are highly similar to those involved in *State v. Ayala,* 178 Ariz. 318, 873 P.2d 656 (1993). In *Ayala,* police received an anonymous tip that the defendant and another person were responsible for a break in at a local business. Officers appeared at the defendant's house the following morning without a warrant. They were met at the door by the defendant's fifteen-year-old brother. The boy readily opened the door and motioned to the officers to come in. They followed the boy into the house and down the hall to the bedroom. It was unclear whether or not the boy had motioned to them to come with him to the bedroom. However, the boy did open the bedroom door, awoke the defendant, and told him that someone was looking for him. At that point, the officers told the defendant that they wanted to question him about the break in. The defendant subsequently confessed and then showed the officers where some stolen merchandise was hidden in the house.

The Arizona Court of Appeals concluded that the consent to enter given by the defendant's fifteen-year-old brother was valid. Consequently, the confession and the evidence obtained from the defendant did not warrant suppression. The Arizona court placed heavy emphasis on the purpose of the police officers' visit and the totality of the circumstances surrounding the visit:

[T]he purpose of the officers' visit was not to search the premises, but rather to talk to the defendant. Additionally, there was no superior demonstration of power or authority to support a finding that the entry was coerced, rather than the natural response of an appropriately mature and responsible youth.

... The officers' purpose was to speak with appellee, not to search the premises. They first asked to speak with a parent, and then asked to speak with appellee. They did not request permission to enter; rather, a teenage boy admitted them into the house in direct response to their inquiry as to appellee's whereabouts. Considering the circumstances as a whole, the officers could reasonably have concluded that this ado-

lescent had the authority to consent to their entry into the house.

*Id.* at 657.

■ In the case before us, the testimony reflected that the officers similarly made no effort to coerce or to deceive Malcolm into granting them entry. There was no demonstration of power or show of force. Instead, they simply asked permission to speak with Perkins, which Malcolm immediately granted without hesitation or question before inviting them into the house. From this evidence, the trial court was justified in concluding that Malcolm's consent for the officers to enter was not coerced or unauthorized. Perkins made no effort to object to the officers' presence in his home. He did not admonish his son for having admitted the officers nor did he attempt to revoke the consent given by his son. We conclude that the officers acted reasonably in believing that Malcolm had sufficient control and apparent authority over the premises to give valid consent to their entry.

Perkins next argues that after the officers were allowed into his house, they improperly proceeded to walk to his bedroom instead of remaining in the living room area. He argues that they could not have reasonably expected that Malcolm's consent to their initial entry should have been construed as stretching farther into the house to a bedroom not visible from the entrance. Consequently, he contends that the officers should be considered to have exceeded the scope of the consent and that the evidence taken from his bedroom should, therefore, be suppressed.

■ During the suppression hearing, Banks testified that the officers followed Malcolm through the kitchen and took a right turn down a hallway. Malcolm pointed to a room on the left and stated, "He's in there." The door to the bedroom was open. Banks also recalled that Malcolm had said, "Follow me" as he led the officers to the bedroom. Miller, too, testified that Malcolm walked them back to Perkins's bedroom. These facts support the proposition that the officers never exceeded the scope of valid consent in following Malcolm to his father's bedroom. While this testimony was not presented until trial, it constitutes more than substantial evidence in support of the trial court's ruling to deny the motion to suppress.

Perkins contends that the police should have obtained a search warrant because they wholly expected to discover contraband which they would seize. He acknowledges that the police had received numerous complaints about him—including the call from the anonymous informant advising them that he possessed cocaine. He also observed that Trooper Banks contacted two other units, including a K–9 unit, and met at a shopping center to discuss strategy prior to proceeding to the Perkins residence. Thus, Perkins argues that because the police had probable cause for a search, they should have obtained a warrant instead of conducting a knock-and-talk visit.

In support of his argument, Perkins replies primarily upon *United States v. Chambers,* 395 F.3d 563 (6th Cir.2005), in which the Sixth Circuit Court of Appeals granted a defendant's motion to suppress evidence taken from his home during a warrantless search because there had been probable cause for a warrant and that, therefore, a warrant should have been obtained. In *Chambers,* police had received information about the defendant's methamphetamine operation from a known and reliable informant; as a result, they conducted extensive surveillance for three days on the defendant's home—including helicopter flybys. *Id.* at 566–67. Their surveillance:

... uncovered frequent nighttime visits to this remote location by numerous people in cars, some with out-of-county license plates—visits that Officer Freeman believed were consistent with customers purchasing drugs from the meth lab that the informant had described. In addition, at the trailer home in this remote farming area, the officers observed that Chambers was using surveillance cameras and several high intensity spotlights to keep watch over the area-all of which fully corroborated the confidential informant's report to the police. There was now strong, indeed overwhelming, evidence of multiple drug sales at the premises on a daily basis, evidence supporting the informant's statements that a meth lab was in frequent operation at the Chambers home.

*Id.* at 567. Three months after this surveillance, police received a call from an anonymous person advising them that Chambers was cooking methamphetamine at his home as the call was being placed.

Nonetheless, the police did not seek a search warrant. Instead, they visited Chambers's home to conduct a knock-and-talk visit. Meanwhile, they had contacted a federal DEA task force agent and advised him to be ready for a search at the residence. Three cars of armed deputies drove to the house. They knocked on a glass entry door of the trailer home. A woman approached the glass door to answer the knock, but she retreated when she saw that the police were at the door, calling out audibly that police were there. The police heard footsteps inside the trailer as the woman went into another room. They then characterized the knock and the occupant's subsequent refusal to talk as "exigent circumstances" that justified entry. They immediately went through the door with guns drawn to begin their search. *Id.* at 567–68.

The *Chambers* court held that evidence taken from Chambers's premises should be suppressed. Although the government claimed that it lacked probable cause for a search warrant, the court disagreed, noting that the officers had information from a confidential informant, bolstered by their own extensive surveillance and evidence from the anonymous caller. They had advised the DEA in advance of the impending search, highlighting their intention aforethought to conduct a search. The court also noted the fact that the police arrived in three cars and entered the home with their guns drawn. "Knock and talk" was wholly pretextual under circumstances that clearly required a warrant.

The facts in *Chambers* are highly distinguishable from the facts at issue in this case. The only information that police had received about Perkins's activities was an anonymous tip from an unknown party. When he was questioned about whether he expected to find contraband at Perkins's residence that evening, Banks responded that he did not have a feeling one way or another—a sentiment that was seconded by Miller. Under the facts of this case, probable cause was not so clearly established as to preclude the reasonableness of a knock-and-search visit.

■ Perkins next argues that the trial court erred in denying his motion to suppress evidence of the cocaine taken from his bedroom because it had been materially altered. He contends that the evidence was unreliable because two baggies of the suspected cocaine were in the possession of the KSP crime lab on two separate occasions—with different weights ascribed to the baggies on each occasion. Therefore, he claims that the Commonwealth could not establish the proper chain of custody of the cocaine. Perkins also argues that the evidence was unreliable because the crime lab reports reflected that

the nature of the contents of the baggies changed from one occasion to the next. The first report indicated that the baggies contained cocaine; the second indicated that they contained cocaine hydrochloride. In response, the Commonwealth claims that this issue is not preserved for our review.

■ Perkins filed this motion to suppress on the morning of the first day of trial. Declining to rule on the motion at that juncture, the trial court advised that it would rule on the admissibility of the evidence as to chain of custody when it was presented at trial. During trial, the cocaine was introduced into evidence. Perkins made no objection or request for a ruling. The trial court accordingly made no formal ruling on the admissibility of the cocaine. Our case law is well established that a failure to press a trial court for a ruling or an admonition on an objection or on a motion for relief operates as a waiver of that issue for purposes of appellate review. *Hayes v. Commonwealth,* 175 S.W.3d 574, 596 (Ky.2005); *Commonwealth v. Pace,* 82 S.W.3d 894, 895 (Ky. 2002); *Dillard v. Commonwealth,* 995 S.W.2d 366, 371 (Ky.1999); *Bell v. Commonwealth,* 473 S.W.2d 820, 821 (Ky.1971). Accordingly, as the trial court did not rule on Perkins's motion to suppress, and as Perkins failed to demand such a ruling, Perkins is deemed to have waived the issue.

■ Perkins last contends that the trial court erred by tendering a possession instruction to the jury as a lesser-included offense of the pending trafficking charge. As we observed earlier, the original indictment against Perkins included a count of first-degree possession of a controlled substance. A second indictment was later returned charging Perkins with first-degree trafficking in a controlled substance. On October 12, 2005, the Commonwealth filed a motion to consolidate the two indictments. In that motion, the Commonwealth noted that the trafficking charge was actually "a superseding indictment involving the same incident as it relates to the possession charge in the first indictment." The indictments were consolidated in a later order referencing an agreement of the parties that the trafficking charge survived and the possession charge was dismissed.

At trial, Perkins did not submit a possession instruction to the court as a lesser-included offense of trafficking, nor did he request that such a possession instruction be given. Nonetheless, the trial court gave a possession instruction as the evidence presented warranted such an instruction. Perkins now argues that the trial court erred in instructing the jury on possession because he did not request such an instruction and because the original possession charge against him had been dismissed. The Commonwealth argues that this argument is not properly preserved as required by Kentucky Rule of Criminal Procedure (RCr) 9.54(2). We have elected to address this issue regardless of the arguably tentative nature of its preservation.

■ Our courts have long held that "[i]n a criminal case, it is the duty of the court to prepare and give instructions **on the whole law.**" *Lee v. Commonwealth,* 329 S.W.2d 57, 60 (Ky.1959). (Emphasis added.) This rule extends to any lesser-included offenses that are supported or encompassed by the evidence. *Houston v. Commonwealth,* 975 S.W.2d 925, 929 (Ky. 1998). Therefore:

> [i]t follows that the giving of an instruction on lesser-included offenses when the evidence would permit a jury to rationally find a defendant guilty of the lesser-included offense and acquit him of

the greater offense is not erroneous, **even if given over the defendant's objection.**

*Smith v. Commonwealth,* 737 S.W.2d 683, 688 (Ky.1987) (Emphasis added).

Our review of the record reflects that a jury reasonably might have found Perkins guilty of possession of a controlled substance instead of trafficking in a controlled substance. Perkins has cited no authority in support of his position that the voluntary dismissal of the possession charge against him precluded the trial court from subsequently tendering a possession instruction to the jury—especially since possession is a lesser-included offense of trafficking and the evidence supported such an instruction. While the trial court may not have had an obligation to tender a possession instruction to the jury in the face of an objection by Perkins, its decision to do so was not erroneous. It retained the discretion to so instruct. *Id.*

The judgment of the Knott Circuit Court is affirmed.

ALL CONCUR.