**STATE of Tennessee**

v.

**Darryl Jerome MOORE.**

Court of Criminal Appeals of Tennessee, at Nashville.

April 21, 2009 Session.

Aug. 10, 2009.

Application for Permission to Appeal Denied by Supreme Court Feb. 22, 2010.

Glenn R. Funk, Nashville, Tennessee, for the appellant, Darryl Jerome Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Upon conditional guilty pleas, the Defendant, Darryl Jerome Moore, was convicted of one count of conspiracy to deliver 300 grams or more of cocaine; one count of conspiracy to deliver 300 pounds or more of marijuana; and one count of possession with intent to deliver 300 grams or more of cocaine, all Class A felonies. *See* Tenn. Code Ann. § 39–17–417(j)(5),(13)(A). He also conditionally pleaded guilty to one count of possession with intent to deliver ten pounds or more of marijuana, a Class D felony; one count of money laundering, a Class B felony; and one count of unlawful possession of a weapon as a result of having been previously convicted of a felony drug offense, a Class E felony. *See* Tenn.Code Ann. §§ 39–14–903, –17–417(g)(2), –17–1307(b)(1)(B). He was sentenced as a Range I, standard offender and received twenty-five years for each of his three Class A felonies, twelve years for money laundering, four years for possession with intent to deliver ten pounds or more of marijuana, and two years for unlawful possession of a weapon. He was sentenced to serve each of these sentences consecutively to the others, for a total effective sentence of ninety-three years in the Department of Correction. As a term of his conditional plea of guilty, the Defendant reserved a certified question of law challenging the trial court's denial of his motions to suppress evidence seized by law enforcement. In this appeal, the Defendant contends that the trial court erred in denying his motion to suppress electronic surveillance evidence because: (1) the three relevant wiretap applications lacked probable cause as required by Tennessee Code Annotated section 40–6–304(c)(1); (2) those wiretap applications failed to demonstrate the necessity of electronic surveillance as required by Tennessee Code Annotated section 40–6–304(a)(3); (3) the wiretap applications failed to particularize probable cause for the interception of di-

rect connect communications in addition to normal phone calls and were thus overbroad to the extent that such interception was authorized; (4) law enforcement failed to follow appropriate minimization procedures, as required by Tennessee Code Annotated section 40–6–304(e), including a failure to minimize calls using call waiting and call forwarding features; and (5) the State violated the sealing and confidentiality rules contained in Tennessee Code Annotated section 40–6–304(f).[1] The Defendant also contends that the trial court erred in denying his motion to suppress the fruits of a search of his residence because: (1) police impermissibly searched areas of the residence without a warrant; and (2) the police's subsequently obtained warrant for further search of his residence did not contain probable cause. Finally, the Defendant argues that the trial court erred in ordering consecutive sentencing. After our review, we affirm the Defendant's convictions and sentences.

### Factual Background

Non-sentencing testimony in this case was presented at two hearings on defense motions to suppress evidence. The first hearing took place on March 28, 2007, and dealt with the Defendant's motion to suppress the fruits of electronic surveillance the police had conducted using wiretaps on cell phones owned by the Defendant and others. Officer Philip Taylor, an investigator with the Twentieth Judicial District Drug Task Force, served as the affiant on the wiretaps in this case and described himself as "the paperwork guy." He introduced into evidence a chart depicting all of the phone numbers wiretapped by police in the investigation underlying this case. Police first obtained an order on November 28, 2005, to wiretap a phone subscribed to by DeWayne Pollard but used by a co-defendant, Timothy Brown. Based on information received through that wiretap, on December 12, 2005, the Task Force obtained a wiretap on another phone subscribed to and used by Brown and then another used by Brown but subscribed to by Lavonzel Adams on December 29, 2005.

Based on conversations intercepted on those wiretaps, on January 23, 2006, the Task Force obtained another wiretap on a phone subscribed to and used by Charles Farrar. David Moore, the Defendant's brother, was intercepted on that wiretap and on previous wiretaps, leading to a January 24, 2006 wiretap on a phone subscribed to by Barbara Moore but used by David Moore. The Defendant and his phone number were intercepted on that wiretap on March 17, 2006, leading to a wiretap on his phone beginning on March 23, 2006. This case predominantly concerns the wiretaps on Brown, David Moore, and the Defendant. All targeted phones in this case are cellular phones.

Judge Monte Watkins issued the wiretap orders in this case. Officer Taylor described the procedures followed to intercept communications and ensure compliance with Judge Watkins' orders. The police maintain a secure wiretap room containing computers designed to intercept and record any communications to or from a target phone. The computer allows the person monitoring a call to note a synopsis of its contents and the parties involved in the communication. If a call is deemed to be non-pertinent to the targeted criminal activity and therefore outside the scope of the wiretap order, the monitor is to click a particular button on the screen, thereby minimizing the audio feed and ceasing to

---

**1.** For analytical efficiency, we have reordered and consolidated some of the subparts of the Defendant's certified question.

record. Any monitored conversation or portion thereof is recorded to a write-only hard drive.

The minimization practices in this case provided monitors with a "spot-monitoring" interval. Officer Taylor explained that these intervals typically range from fifteen to sixty seconds. A monitor is allowed to temporarily re-engage a previously minimized audio feed as each spot-monitoring interval passes in order to confirm that the intercepted conversation still involves the same parties and is still non-pertinent. Officer Taylor then described the problems that can be caused by target phones with call waiting and call forwarding features:

> [Officer Taylor]: Call forwarding and call waiting are features that cause problems if they're used extensively by the target. If you're off a call for thirty seconds, some targets that use it extensively can have a call come in for fifteen or twenty seconds during that time or any portion of that time you've got it minimized. And that, of course, is lost. It will show the call record that that call came in, but the audio on it will not appear anywhere in the system. So that's one of the considerations we have to weigh out when we're deciding how long and when to minimize and whether they use that feature, whether they were expecting a call from somebody, from a co-conspirator that may just be, hey, I'm at the hotel, which wouldn't take but fifteen or twenty seconds, and you could miss it if ... you've got the call minimized for a minute or so. In forty-five seconds to a minute you could miss the call.

Officer Taylor noted that most of the phones targeted in the investigation had a call waiting feature, including the Defendant's. He also testified that the police tended to develop monitoring practices based on their determination of whether a particular target frequently used such features, not based merely on the presence of such features. Police thus fully developed minimization procedures after surveillance began.

On cross-examination, Officer Taylor also discussed another service enabled on the Defendant's phone called "push-to-talk," "direct connect" or "chirping." The direct connect feature allows a phone to act as a walkie-talkie, meaning that the phone can transmit a one-sided message to a similarly-enabled phone and then wait for a response. Rather than taking place across a connection between two phone numbers, a direct connect device is contacted through the use of a separate direct connect number. Officer Taylor testified that the wiretap application for the Defendant's phone included its native ESN number, meaning any communications from that device would be intercepted. The application did not, however, specifically mention interception of communications made using the direct connect function.

Officer Taylor also noted his awareness that members of the news media retrieved and broadcast recordings of certain communications intercepted during the Task Force's investigation.

The trial court then, on May 9, 2007, held a second hearing in order to rule on the Defendant's motion to suppress the fruits of a warrantless entry onto his property and a subsequent warrant-supported search. The events at issue in this second hearing occurred on April 1, 2006. On that day, Edward Rigsby, a Metro Nashville Police Department officer assigned to the Twentieth Judicial District Drug Task Force, was charged with operating the wire room and intercepting calls to and from the Defendant's phone. After recording pertinent calls, he would review

them and pass information on to field officers.

Officer Rigsby's testimony, as well as his affidavit in support of the warrant eventually used in this case, establish a sequence of pertinent phone calls to and from the Defendant's cell. On March 28, 2006, the Defendant made a call to an unknown Hispanic subject and said that his "dude from Kentucky" would not arrive until Friday. The unknown subject asked the Defendant "how many" he wanted him to send. The Defendant replied, "20 or 30."

Two days later, on March 30, 2006, the Defendant received a call from the same unknown subject. He advised the Defendant that "Felix" would arrive at 6:00 or 7:00 p.m. The Defendant responded that the "dude from Kentucky," who "owed him for like 10 or 8" would not arrive until after that time, and he asked to have Felix delay until Saturday.

Officer Rigsby intercepted a number of calls on April 1, 2006. The first came at 8:58 a.m. from Rodney Gilbert, who, receiving no answer from the Defendant, left a message asking the Defendant to call so he could "give [the Defendant] what he got from him." Between 9:03 and 9:05 a.m., the Defendant received two calls from the unknown subject, during which the Defendant arranged to meet "Felix" in one hour. At 9:06 a.m., the Defendant called Gilbert and arranged to meet in thirty minutes. The Defendant's destination was "pop's house," a term known by police to refer to the Defendant's father's residence at 1001 West Delmas. No phone call indicated the type of vehicle in which the drug delivery would arrive.

Based on this information, police set up surveillance of 1001 West Delmas on April 1. Sergeant James McWright testified that his and two other unmarked police cars sat near railroad tracks about two blocks away from the driveway and near the intersection of West Delmas and Cherokee Road. Other unmarked cars were positioned some distance down West Delmas, on the other side of the residence. Tennessee Bureau of Investigation Agent Joey Clark provided aerial surveillance from a circling aircraft. Sergeant McWright had a good view of the driveway, but the layout of the residence and surrounding grounds made it impossible to set up surveillance with a clear view of the house. Sergeant McWright also judged that anyone placed around the back of the house would have been discovered.

After some time, Sgt. McWright and the other surveillance officers observed a tan Nissan Pathfinder turn onto West Delmas and proceed into the driveway. No officer could see into the Pathfinder, and therefore, they could not determine whether it carried a delivery of drugs. It was believed that two men were in the Pathfinder, but no officer could confirm whether they were Hispanic. Sergeant McWright had never seen the Pathfinder before, although he had not conducted extensive surveillance on the house before and was not familiar with all of the vehicles normally present at the house. From his aircraft, Agent Clark informed Sgt. McWright that the Pathfinder had driven inside the detached garage behind the house and had closed the garage door behind it. This occurred at about 11:17 a.m.

Shortly thereafter, Sgt. McWright saw a red Corvette convertible turn from Cherokee onto West Delmas directly in front of his surveillance location. Sergeant McWright knew from previous wiretaps that one of the Defendant's associates, Lorenzo Roberts, had just purchased a red Corvette. Driving by, Roberts "looked dead at" Sgt. McWright and "did a double take." Roberts then proceeded down West Delmas but drove past the house, eventually disappearing from view.

Officer Rigsby then, at 11:22 a.m., intercepted the following conversation between the Defendant and Roberts:

[The Defendant]: Hello.

[Roberts]: D–Money.

[The Defendant]: What up my niggs?

[Roberts]: Man D I just seen some of the ... D for real dude. Is this line good.

[The Defendant]: Yeah, I'm good.

[Roberts]: Naw D, I just seen some of the weirdest shit D. I ain't even bullshittin' dude.

[The Defendant]: What?

[Roberts]: I ... just bro ... listen ... listen closely what I'm saying.

[The Defendant]: I'm listening.

[Roberts]: You know when I say them.

[The Defendant]: When you what?

[Roberts]: Them. Them.

[The Defendant]: Who is them?

[Roberts]: You know who them is .... Them.

[The Defendant]: The folks.

[Roberts]: Ah-huh.

[The Defendant]: Ah-huh.

[Roberts]: On ... on ... like by on Pops street. And then I'm talkin' about them mother fuckers look like they waiting on something. And I'm not even....

[The Defendant]: On my street?

[Roberts]: Yeah. Them mother fuckers look like they waitin' on something dude I'm talking about ... I'm coming over the railroad tracks. I see a couple two three, I'm like damn, they look like them ... they on the side of the street. You know what I mean, like just sittin' waitin'.

[The Defendant]: Ah my nigga, and ... and my folks is right here.

[Roberts]: Where they ... not on that street.

[The Defendant]: Yeah, they in my garage right now.

[Roberts]: I'm not even bull shittin' D.

[The Defendant]: Oh my God. Oh yeah.

[Roberts]: Man I ... I am not even bull shittin' dude.

[The Defendant]: God damn.

[Roberts]: They need to.... They need to man whatever ... and in a bag jump the fence and keep on going never come up out of that mother fucker. I'm not ...

[The Defendant]: Okay. Okay.

[Roberts]: They need to get.

[The Defendant]: For sure.

[Roberts]: All right, one.

Officer Rigsby testified regarding his interpretation of this conversation. In his experience, the Defendant used the word "folks" to refer to both police and suppliers; in the conversation above, Officer Rigsby believed that the Defendant eventually understood "the folks" to mean "police." The Defendant then referred to "[his] folks," meaning the suppliers that had earlier arrived in the Pathfinder.

After Officer Rigsby relayed the substance of the call, Sgt. McWright ordered his team to prepare to secure the property. Sergeant McWright had no specific information about any fleeing suspect or about any drugs being destroyed, although he testified that he had known large-volume drug dealers to keep vats of acid in which large quantities of drugs could be dissolved in an emergency. Sergeant McWright called for two backup units to assist them. When those units arrived at 11:35 a.m., Sgt. McWright ordered the scene secured. He did not participate, however, instead driving away to look for Roberts.

After receiving Sgt. McWright's order, Sgt. Richard Hamilton moved behind 1001

West Delmas to its detached garage. He saw that some Sumner County officers had already secured the Defendant's father, James Moore. Other officers stood near the detached garage; both of its carport doors were down, and the single walk-through door was locked. James Moore said he had a garage door opener in his truck. He retrieved it. An officer pressed the door opener two or three times; each time, one of the garage doors went up a few feet before stopping and going back down. Each time, officers could see someone's leg inside the garage.

Sergeant Hamilton therefore ordered other officers to kick down the walk-through door. They did so. The Defendant walked out the door, laid on the ground, and was taken into custody. Officers entered the garage and found Felix Mejia and Jorge Lemus inside. The two were taken into custody. The Defendant, Mejia, and Lemus were each placed into separate police cars. While the three suspects were being removed from the garage, Agent Kelly Murphy saw a yellow fifty-five-gallon drum sitting about ten feet from the Pathfinder. He also saw what appeared to be twelve kilograms of cocaine sat on top of the drum. Officers checked the residence for any potential dangers, but they did not otherwise search it.

Officer Rigsby then began preparing a warrant for the search of 1001 West Delmas and four other locations of interest in the wider investigation. He did not arrive with the warrant until 9:00 p.m., finding officers still at the residence, having preserved the integrity of the scene. When Officer Rigsby arrived at 1001 West Delmas, he found Sgt. Hamilton in the kitchen with James Moore, upon whom Officer Rigsby served the warrant. Officers

found no contraband inside the house.[2] Upon a thorough search of the garage, however, they found a loaded twenty-gauge shotgun, a loaded handgun, approximately 100 pounds of cocaine, and approximately 100 pounds of marijuana.

The trial court denied both of the Defendant's motions to suppress in a thorough order filed July 5, 2007. The Defendant then entered a conditional guilty plea, reserving the certified questions of law for our review.

## Analysis

Tennessee Rule of Criminal Procedure 37(b) provides that a defendant may appeal from any judgment of conviction on a plea of guilty or nolo contendere, if:

(A) the defendant entered into a plea agreement under Rule 11(a)(3) but explicitly reserved—with the consent of the state and of the court—the right to appeal a certified question of law that is dispositive of the case, and the following requirements are met:

(i) the judgment of conviction or other document to which such judgment refers that is filed before the notice of appeal, contains a statement of the certified question of law that the defendant reserved for appellate review;

(ii) the question of law is stated in the judgment or document so as to identify clearly the scope and limits of the legal issue reserved;

(iii) the judgment or document reflects that the certified question was expressly reserved with the consent of the state and the trial court; and

(iv) the judgment or document reflects that the defendant, the state, and the trial court are of the opinion that the

---

**2.** Agent Murphy testified at the Defendant's sentencing hearing that police did find nearly $150,000 in cash inside the house.

certified question is dispositive of the case. . . .

Tenn. R.Crim. P. 37(b)(2); see *also State v. Irwin,* 962 S.W.2d 477, 478–79 (Tenn. 1998); (2) *State v. Pendergrass,* 937 S.W.2d 834, 836–37 (Tenn.1996); *State v. Preston,* 759 S.W.2d 647, 650 (Tenn.1988).

### I. Motions to Suppress

 The Defendant first contends that the trial court erred in denying both of his motions to suppress evidence. "[A] trial court's findings of fact at a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith,* 978 S.W.2d 861, 864 (Tenn.1998). However, we review de novo a trial court's application of law to the facts. *See State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997).

### A. Motion to Suppress Fruits of Electronic Surveillance

The Defendant contends that the State violated numerous provisions of the Wiretapping and Electronic Surveillance Act. The trial court denied him relief on each of these alleged violations after the hearing on his motion to suppress electronic surveillance.

The Wiretapping and Electronic Surveillance Act, Tennessee Code Annotated section 40–6–301 to –311, allows certain judges to issue orders authorizing interception of wire, oral, or electronic communications upon the application of law enforcement. Tenn.Code Ann. § 40–6–304. The application must include the following:

(1) the identity of the applicant officer and the district attorney general authorizing the application; (2) a full and complete statement of the facts relied upon by the applicant, including details of the offense, a description of the facilities from which the communications are to be intercepted, a description of the type of communication sought to be intercepted, and the identity of all known persons committing the offense and whose communications may be intercepted; (3) a statement of the time period during which the interception must be maintained; and (4) a statement of facts concerning any previous applications. Tenn.Code Ann. § 40–6–304(a). The application also must contain "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Tenn.Code Ann. § 40–6–304(a)(3).

A qualified judge may issue an ex parte order authorizing interception upon finding (1) "[t]here is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 40–6–305," (2) "[t]here is probable cause for belief that particular communications concerning that offense will be obtained through the interception," (3) "[n]ormal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," and (4) "[t]here is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by the person." Tenn.Code Ann. § 40–6–304(c).

The order may authorize interception for up to thirty days, with extensions to be granted as needed. Tenn.Code Ann. § 40–6–304(e). "The thirty-day period begins on the earlier of the day on which the investigative or law enforcement officer first begins to conduct an interception under the order or ten (10) days after the order is entered." *Id.* The order must also require reports to be made to the issuing judge, at ten-day intervals, "showing what progress has been made toward achievement of the authorized objective and the need for continued interception." Tenn. Code Ann. § 40–6–308(c); *see also State v. John A. Boatfield,* No. E2000–01500–CCA–R3–CD, 2001 WL 1635447, at *12 (Tenn.Crim.App., Knoxville, Dec. 20, 2001) (describing generally the statutory requirements of the Wiretap Act).

### i. Probable Cause

The Defendant first contends that the trial court erred in holding that the relevant wiretap applications contained information sufficient to support Judge Watkins' finding of probable cause that targets were committing, had committed, or were about to commit a crime included in Tennessee Code Annotated section 39–17–417(j), in this case the manufacture, delivery, sale, or possession of 300 grams or more of cocaine or 300 pounds or more of marijuana. *See* Tenn.Code Ann. § 40–6–305. The Defendant challenges the applications for wiretaps on two phones used to obtain evidence against him, as well as the application for a wiretap on his phone. The first challenged application related to the phone subscribed to by DeWayne Pollard but used by Timothy Brown. We will identify this phone by its number, 485–3757. The second related to a phone subscribed to by Barbara Moore but used by

David Moore. That phone's number is 948–5034. The Defendant's phone number is 507–5291.

██ We must decide whether the trial court erred in finding that Judge Watkins had a "substantial basis for concluding that a search warrant would yield evidence of wrongdoing." *State v. Jacumin,* 778 S.W.2d 430, 432 (Tenn.1989) (citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). "[I]n passing on the validity of a warrant, the reviewing court may consider only the information brought to the magistrate's attention." *Id.* (citing *Aguilar v. Texas,* 378 U.S. 108 n. 1, 84 S.Ct. 1509, 12 L.Ed.2d 723). "In reviewing the validity of an electronic surveillance order, we will accord 'great deference' to the determination of the issuing judge." *United States v. Corrado,* 227 F.3d 528, 539 (6th Cir.2000).

### a. 485–3757

██ The probable cause section[3] of the application for a wiretap on the first phone used by Timothy Brown, attached to the number 485–3757, stated that a confidential informant ("CI") designated "CS" agreed to cooperate with police after being discovered in possession of a quarter of a pound of marijuana. CS told investigators he had received the marijuana from "Tim" and provided police with Tim's phone number and address. Nashville Electric Service records showed the property at that address belonged to Timothy Brown. CS also stated that Brown had offered to sell him eight to ten pounds of marijuana and had discussed a $38,000 investment in cocaine. On or about September 19 or 20, 2005, CS received a delivery of cocaine

---

**3.** In each application, this section is titled "Probable Cause that Target Subjects and the Target Telephone are Involved in a Specified Criminal Offense."

from Brown. On September 23, 2005, with CS' consent, police recorded a conversation between CS and Brown discussing the money CS owed Brown for that delivery. Police later recorded another call to that effect and provided CS with $1,000. CS delivered that money to Brown.

Another CI, designated "CS–2," contacted police from Metropolitan Nashville Jail and indicated his willingness to cooperate in exchange for favorable consideration on pending drug charges. CS–2 gave information about Michael Shane Adams, "right-hand man" to Charles Farrar. He also noted that a "male black" acted as Farrar's cocaine distributor. When shown a picture of Timothy Brown, CS–2 identified him as this distributor. CS–2 also provided accurate information that Brown worked at Farrar's business, and his information about Farrar's drug organization was consistent with information discovered by police during their previous investigation of Farrar. Finally, a call record analysis disclosed twenty-one phone calls between Brown and Farrar between September 29 and November 23, 2005, and eighteen phone calls between Brown and another Farrar associate, Randy Tanner.

■ In attacking the sufficiency of probable cause, the Defendant predominantly argues that CS–2 was an unreliable informant because the wiretap application did not state with particularity the ways in which his description of Farrar's organization corroborated information already known to police. Tennessee applies the two-pronged *Aguilar–Spinelli* test in judging whether information obtained from a CI is sufficiently reliable to provide probable cause. *Jacumin,* 778 S.W.2d at 436; *see also Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). That test

requires that the CI's "basis of knowledge" and "veracity" be established. *Jacumin,* 778 S.W.2d at 432.

Under the "basis of knowledge" prong, "facts must be revealed which permit the magistrate to determine whether the informant had a basis for his information that a certain person had been, was or would be involved in criminal conduct or that evidence of the crime would be found at a certain place." *State v. Moon,* 841 S.W.2d 336, 338 (Tenn.Crim.App.1992). Under the "veracity" prong, "facts must be revealed which permit the magistrate to determine either the inherent credibility of the informant or the reliability of his information on the particular occasion." *Id.*

Both CS and CS–2 had personal knowledge of Brown's criminal activities; we therefore conclude that police established the basis of knowledge possessed by each. Neither had worked with the police before, however, and their veracity must thus be established by corroborating information. *See State v. Xavier Kenta Lewis,* No. M2005–02062–CCA–R3–CD, 2006 WL 2380614, at *6 (Tenn.Crim.App., Nashville, Aug. 16, 2006). The monitored phone calls and controlled cocaine buy between CS and Brown sufficiently corroborate CS' information and veracity.

The Defendant is correct that the wiretap application does not sufficiently describe what previously-known facts about Farrar's organization were corroborated by CS–2. The application also does not reflect that CS–2 made any statements against his penal interest. CS–2's designation of Brown specifically as Farrar's cocaine distributor was, however, corroborated to some extent by C S' previous information and by the cocaine he purchased from Brown. The later call record analysis also corroborated that CS–2 was correct in stating that Brown, who he visually identified using a photo-

graph, had some relationship with Farrar. We conclude that the information submitted for CS–2 met the minimum standard to establish veracity. We therefore also conclude that the trial court did not err in holding that the application provided Judge Watkins with probable cause to order a wiretap of 485–3757.

### b. 948–5034

 The probable cause section of the application for a wiretap on the phone used by David Moore stated that Brown, his calls now subject to interception, made a number of calls to David Moore at 948–5034. Those calls revealed David Moore to be one of Brown's cocaine suppliers. The application contains transcripts of four calls between Brown and David Moore. As the calls frequently involve "cryptic language," Officer Taylor provided italicized interpretations "based on [his] years of experience in drug investigations, [his] listening to tape recordings of undercover conversations between drug dealers, and listening to thousands of conversations recorded during the court ordered wiretaps of drug dealers." These transcripts reveal a number of conversations about cocaine sales. We conclude that the trial court did not err in holding that the application provided Judge Watkins with probable cause to order a wiretap of 948–5034.

### c. 507–5291

 The probable cause section of the application for a wiretap on the phone used by the Defendant stated that David Moore, his calls now subject to interception, made a number of calls to the Defendant at 507–5291. These calls revealed the Defendant to be his cocaine supplier. The application contains transcripts of four calls, each interpreted by Officer Taylor as on the previous application. These transcripts also reveal a number of conversations about cocaine sales. We conclude that the trial court did not err in holding that the application provided Judge Watkins with probable cause to order a wiretap of 507–5291.

### ii. Necessity

The quantum of law enforcement activity necessary to demonstrate that other investigative procedures have been tried and failed, that they reasonably appeared to be unlikely to succeed if tried, or that they reasonably appeared to be too dangerous has apparently not been addressed by Tennessee appellate courts. This section, as codified in Tennessee Code Annotated section 40–6–304(a)(3), matches that in Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *See* 18 U.S.C.A. § 2518(1)(c) ("Title III"). As such, we consult the Sixth Circuit Court of Appeals and the United States Supreme Court for guidance on the "necessity requirement." *United States v. Carneiro,* 861 F.2d 1171, 1176 (9th Cir.1988).

 The necessity requirement of Title III is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) (citing S.Rep. No.90–1097, at 101, *as reprinted* in 1968 U.S.C.C.A.N. 2112, 2190). Law enforcement is not required to "exhaust every conceivable non-wiretap investigative technique." *United States v. Lambert,* 771 F.2d 83, 91 (6th Cir.1985). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Id.* (citing *United States v. Alonso,* 740 F.2d

862, 868 (11th Cir.1984); *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir. 1984)).

■ A Title III wiretap need not be used as a last resort, *see United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir.1977) (quoting *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir.1975)), but the United States Sixth Circuit Court of Appeals has also noted that

> [w]hile the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are likely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be, in our view, an inadequate compliance with the statute. We agree with the Eighth Circuit that "the mere fact that the affidavit before us rested in part on statements that would be equally applicable to almost any gambling case does not render the affidavit insufficient." *United States v. Matya*, 541 F.2d 741, 745 (8th Cir.1976).... What is required in addition, however, is information about particular facts of the case at hand which would indicate that wiretaps are not being "routinely employed as the initial step in criminal investigation." [*United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)].

*Landmesser*, 553 F.2d at 20. We interpret Tennessee Code Annotated section 40–6–304(a)(3) in light of these precedents.

### a. 485–3757

■ The application for a wiretap on Timothy Brown contains an extensive necessity section[4] discussing the unfeasibility of further physical surveillance, use of CIs, infiltration by undercover officers, general questioning, search warrants, and review and analysis of telephone records.

Officer Taylor's application notes that physical surveillance, in his experience, occasionally sufficed to catch suspects making drug deliveries but rarely identified a supplier. Physical surveillance thus did not "disclose the full extent of a drug trafficking organization." It also generally did not provide prior knowledge to the police of drug activities and was therefore "hit or miss." As to the investigation at issue in this case, Officer Taylor noted that physical surveillance of Brown's workplace revealed, through the tag number of a vehicle outside, that a particular visitor had a record of cocaine-related charges and arrests. Planning to conduct a traffic stop on that visitor, the police instead, and by accident, conducted a traffic stop on Brown, using a K–9 unit in an attempt to detect drugs. Thereafter, Brown told CS he believed he was being followed and that someone was trying to set him up. Brown's caution bolstered Officer Taylor's belief in the likely futility of further physical surveillance.

According to Officer Taylor's application, CIs have limited value because they do not have full knowledge of a drug enterprise's structure and activities. This is so because major drug traffickers closely guard valuable information such as the location of drug proceeds, bank accounts, storage locations, assets, and suppliers. It can also be difficult to communicate with CIs at essential times. As to the investigation at issue in this case, Officer Taylor noted CS' limited knowledge of Brown's activities and his inability to discover Brown's other customers or suppliers.

---

**4.** In each application, this section is titled "Consideration of Alternative Investigative Procedures."

CS–2 similarly provided limited information and was treated with caution by Farrar, who knew of his pending criminal charges. Officer Taylor also stated that any undercover officer would be placed in significant danger and would likely be unable to gain substantially more information than already provided by CS and CS–2.

In Officer Taylor's experience, general questioning had limited value because those with knowledge of a drug organization tended to be co-conspirators. Those with pending criminal charges were treated with caution by other suspects, and those without pending charges had little incentive to provide information. As to the investigation at issue in this case, Officer Taylor noted that Brown's alarm after his traffic stop would only increase if he discovered police had been questioning his associates.

Officer Taylor also noted that search warrants would have maximum value only after discovering additional evidence about Brown's drug organization. At the time of the application, police were aware of several locations at which some illegal activity appeared to occur, but they knew nothing about any specific drug activity at the locations. Finally, the application notes that "it is extremely difficult, if not impossible, to take any enforcement action based on . . . call detail records"; although they can be useful to identify other phones being used to contact a suspect, they do not reveal the parties to or substance of a conversation.

We conclude the 485–3757 application contains a sufficient "statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See* Tenn.Code Ann. § 40–6–304(a)(3). It sets out, in detail, both general information about the difficulties involved in investigat-

ing a large drug trafficking organization and "particular facts of the case at hand which would indicate that wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" *Landmesser,* 553 F.2d at 20 (quoting *Giordano,* 416 U.S. at 515, 94 S.Ct. 1820).

### b. 948–5034

■ The application for a wiretap on David Moore's phone incorporates by reference Officer Taylor's necessity section from the 485–3757 application. As to physical surveillance it adds that, because David Moore did not know when the targeted shipment of cocaine was to arrive and because such shipments frequently do not arrive on time, police would not know what location to survey. Similar factors discouraged the use of search warrants without evidence first gained from a wiretap.

The Defendant contends that this application fails because it lacks a "particularized demonstration of requisite necessity." We disagree; it contains the additional particularized information discussed above and also incorporated particularized information from the 485–3757 application. Further, David Moore and Brown both operated within the same drug-trafficking organization; evidence of its relative impenetrability to alternate investigative techniques therefore retained its relevance in the 948–5034 application.

### c. 507–5291

■ The application for a wiretap on the Defendant's phone also incorporates by reference Officer Taylor's necessity sections from the 485–3757 and 948–5034 applications. It adds nothing, except to note that without previous wiretaps police would not have discovered the extent or substance of the criminal association be-

tween David Moore and the Defendant or between David Moore and Brown.

Once his involvement became known, the police did not attempt to investigate the Defendant using any alternative techniques. Wiretaps were not employed as the initial step in the police's investigation of the Defendant's drug-trafficking organization, however, nor do we have any evidence that the police employed them "routinely," as forbidden by *Giordano*.

The Defendant notes, correctly, that the police "took ... no substantive investigative action other than wiretapping. ..." He also contends that "after the first wiretap ... [the police] made no good faith effort to augment [ ] requisite necessity." The Wiretap Act, however, does not require the police to do so, provided they explain "why [other investigative techniques] reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See* Tenn. Code Ann. § 40–6–304(a)(3). In our view, again, the information contained in previous wiretap applications and properly incorporated by reference into the 507–5291 application retains its relevance and applicability due to the Defendant's suspected membership in David Moore and Brown's drug-trafficking organization.

Finally, the Defendant contends that the wiretap of his phone lacked necessity because previous wiretaps and resulting surveillance revealed a transfer of one kilogram of cocaine from the Defendant to David Moore, who in turn delivered it to Brown. A description of this incident appears in the probable cause section of the 507–5291 application. The Defendant argues that the police, in declining to arrest David Moore, Brown, and the Defendant, deliberately avoided alternate investigative techniques, such as immediate arrest, for the purpose of "stockpiling tape for use in prosecution." As stated by the orders in this case, however, the investigation had as its objective not merely the discovery of some criminal activity by Brown, David Moore, and the Defendant, but, among other things, "[t]he nature, extent, and method of operation" of the suspects' drug-trafficking business and the "identities and roles of ... co-conspirators." Officer Taylor's applications substantiated his belief that such an immediate arrest would have jeopardized the discovery of further information about the Defendant's drug-trafficking organization. The State has thus demonstrated the requisite necessity for the achievement of the application's stated goals, as borne out by the later arrest of the Defendant along with his previously unknown suppliers Mejia and Lemus. This issue is without merit.

### iii. Interception of Direct Connect Communications

 Two subparts of the Defendant's certified question of law contend that "the Applications related to the Defendant[']s phones failed to particularize probable cause for the interception of walkie-talkie communications in addition to telephone calls on his phone, and therefore, the interception of walkie[-]talkie communications was impermissible," and "that the wiretap Order relating to the Defendant[']s phone was overbroad and erroneously authorized the interception of a form of communication (walkie-talkie communications) not particularized in the Application." The Defendant offers no argument in support of these certified questions, however. They are therefore waived. *See* Tenn. R.Crim. App. 10(b).

### iv. Minimization

 Each of the wiretap applications in this case contains a boilerplate minimization section stating that monitoring will cease upon determination of a call's non-pertinence. It also states that moni-

tors will be instructed to avoid infringing on any privilege and that civilian monitors will take an oath pursuant to Tennessee Code Annotated section 40–6–304(e).

One of the subparts of Defendant's certified question of law states that "the interception of electronic communications were not properly minimized in violation of T.C.A. 40–6–304(e) and 18 U.S.C. 2518(5)." The Defendant offers no argument in support of the contention that the police generally used impermissible minimization procedures, however. The issue is therefore waived. *See* Tenn. R.Crim.App. 10(b). The Defendant also contends that "since the issuing court was not consulted about the [call waiting and call forwarding] features of the phones and their respective impact on minimization, the [c]ourt's ability to supervise was usurped."

The Wiretap Act, however, does not require that case-specific minimization procedures be outlined in the either the application or the order, but it provides that "any order or extension of an order shall contain a provision that the authorization to intercept shall be conducted in a way as to minimize the interception of communications not otherwise subject to interception," Tennessee Code Annotated section 40–6–304(e), a requirement that mirrors that of Title III. *See* 18 U.S.C.A. § 2518(5). The orders in this case comply with that provision. In our view, then, the Wiretap Act does not contain a per se requirement that an issuing judge be advised of call waiting or call forwarding features for minimization purposes. Absent such a requirement, a party challenging police minimization procedures must address the specific procedures and calls at issue and demonstrate that monitoring was not conducted in a way as to minimize the interception of communications not otherwise subject to interception. As the Defendant

offers no such discussion, this issue is without merit.

### v. Sealing and Confidentiality

■■■ One of the Defendant's certified questions of law contends that "the State violated the sealing and unsealing requirements and the confidentiality rules regarding the documents, recording and other contents of electronic surveillance in violation of T.C.A. 40–6–304(f)." The Defendant offers no argument in support of this certified question, however. It is therefore waived. *See* Tenn. R.Crim.App. 10(b).

### B. Motion to Suppress Fruits of April 1, 2006 Search

#### i. Exigent Circumstances

The Defendant next contends that the police's warrantless entry into his garage and residence violated the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution because the police lacked any exigent circumstances absolving them of the warrant requirement. In the alternative, the Defendant argues that the police created any exigent circumstances that may have been present.

#### a. Exigency

The Fourth Amendment to the United States Constitution provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article 1, section 7 of the Tennessee Constitution also guarantees that the people

shall be free from unreasonable searches and seizures.

▓▓▓▓▓ A warrantless search or seizure is presumed unreasonable unless it falls into one of the narrowly defined exigent circumstances exceptions to the warrant requirement. *See Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Fuqua v. Armour,* 543 S.W.2d 64, 66 (Tenn.1976); *State v. Transou,* 928 S.W.2d 949, 958–99 (Tenn.Crim.App.1996). A warrant is unnecessary when exigent circumstances exist that necessitate an immediate arrest. *See State v. Shaw,* 603 S.W.2d 741, 742 (Tenn.Crim.App.1980). Exigent circumstances are limited to three situations: (1) when officers are in "hot pursuit" of a fleeing suspect; (2) when the suspect presents an immediate threat to the arresting officers or the public; or (3) when immediate police action is necessary to prevent the destruction of vital evidence or thwart the escape of known criminals. *See State v. Rodney Ford,* No. 01C01–9708–CR–00365, 1999 WL 5437, at *3 (Tenn.Crim. App., Nashville, Jan. 7, 1999) (citing *Jones v. Lewis,* 874 F.2d 1125, 1130 (6th Cir. 1989)). "The burden is on those seeking the exception to show the need." *State v. Bartram,* 925 S.W.2d 227, 229–30 (Tenn. 1996).

▓▓▓▓▓ In this case, the trial court held that immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals. We agree. Although the Defendant is correct that the police, due to their surveillance dispositions, did not witness any suspect fleeing or destroying evidence, they had, only minutes before, intercepted a compelling telephone call between the Defendant and Roberts. During the call, Roberts specifically advised the Defendant that his visitors should "jump the fence and keep on going." This comment justifi-

ably caused Sgt. McWright's concern that the suspects would flee and, because it indicated that the suspects had a reason to flee, tended to establish the presence of a drug shipment that might be destroyed. This issue is without merit.

### b. Police–Created Exigency

▓▓▓▓▓ The Defendant next contends that, even if exigent circumstances were present, the warrantless entry was illegal because the Task Force created the exigency. This Court has previously recognized various courts' holdings that

exigent circumstances, which would justify a warrantless entry, may not be created by the government's actions. *See, e.g., United States v. Haddix,* 239 F.3d 766, 767–68 (6th Cir.2001) (noting police officers may not created exigent circumstances to justify warrantless intrusions); *United States v. Richard,* 994 F.2d 244, 249 (5th Cir.1993) (holding that officers improperly created the exigency when they announced their presence as "warrantless entry became a foregone conclusion once officers knocked"); *United States v. Munoz–Guerra,* 788 F.2d 295, 298 (5th Cir. 1986) (concluding warrantless entry was improper where officers created the exigency by knocking on the door and announcing their presence without a reason to believe the suspect had prior knowledge of police surveillance); *Hornblower v. State,* 351 So.2d 716, 718 (Fla.1977) (concluding "[t]he suspicious movement which occurred when the police announced their presence cannot supply the exigent circumstances to justify the warrantless search"); *Dunnuck v. State,* [367 Md. 198] 786 A.2d 695, 704–05 (Md.2001) (noting that officer improperly created the exigency by knocking on the defendant's door and alerting him to their investigation);

*State v. Williams,* 615 N.E.2d 487, 488–89 (Ind.Ct.App.1993) (holding that police officers, who had probable cause to believe drugs were present inside the defendant's residence, improperly created the "emergency" by knocking on the door) . . . .

*See State v. William Timothy Carter,* No. W2002–00947–CCA–R3–CD, 2003 WL 22213225, at *4 (Tenn.Crim.App., Jackson, Sept. 24, 2003). Our supreme court also recognized the doctrine's existence in *State v. Hendrix,* 782 S.W.2d 833, 836 (Tenn. 1989), although it did not apply it.

In his brief, the Defendant relies on the facts and holding of *United States v. Chambers,* 395 F.3d 563 (6th Cir.2005). In *Chambers,* police knocked on a trailer home door in an effort to obtain consent to search from its occupants. *Id.* at 568. A woman came to the door but, seeing the police, returned inside the trailer while announcing the police's presence to someone else inside. *Id.* The police then stormed the trailer, claiming to be concerned about destruction of evidence. *Id.* The *Chambers* court suppressed the resulting evidence of a methamphetamine lab, holding that "any exigency was calculated by police in order to facilitate their warrantless search." *Id.* at 569.

These precedents involve situations in which police intentionally make their presence known to suspects; indeed, the *Chambers* court explained that " 'the created-exigency cases have typically required *some showing* of deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement' " *Id.* at 566 (citing *Ewolski v. City of Brunswick,* 287 F.3d 492, 504 (6th Cir. 2002)).

We conclude that the Defendant has made no such showing in this case. Although Sgt. McWright and Sgt. Hamilton essentially testified that 1001 West Delmas was impossible to survey without some risk of exposure, there is no evidence that they deliberately sought such exposure. The surveillance cars bracketed the Defendant's residence, each positioned at least two blocks away so as to avoid being seen by anyone inside. Although they were detected by Roberts, the police had evaded detection by the Pathfinder occupied by Mejia and Lemus that had arrived at 1001 West Delmas minutes beforehand. The record indicates that the police took calculated risks in order to maintain an acceptable level of surveillance on the house. Because they therefore did not intentionally evade the warrant requirement, this issue is without merit.

### ii. Probable Cause for Issuance of Warrant

Based on his belief that the warrantless entry discussed above was impermissible, the Defendant next contends that the sufficiency of the affidavit supporting the police's subsequent search warrant must be examined without the use of any information discovered during that entry. Once any such information is removed, the Defendant argues that the affidavit lacks sufficient information to support the magistrate's probable cause determination. In either case, we must decide whether or not the trial court erred in finding that the issuing magistrate had a "substantial basis for concluding that a search warrant would yield evidence of wrongdoing." *Jacumin,* 778 S.W.2d at 432 (citing *Gates,* 462 U.S. 213, 103 S.Ct. 2317; *Spinelli,* 393 U.S. 410, 89 S.Ct. 584). "[I]n passing on the validity of a warrant, the reviewing court may consider only the information brought to the magistrate's attention." *Id.* (citing *Aguilar,* 378 U.S. 108 n. 1, 84 S.Ct. 1509).

The affidavit supporting the 1001 West Delmas search warrant contains some significant information that would not have

been known but for the police's warrantless entry: knowledge that the Pathfinder contained two Hispanic occupants; knowledge of the Pathfinder's tag number; information that Felix Mejia, Jorge Lemus, and the Defendant were in 1001 West Delmas' detached garage; information that at least twelve kilograms of cocaine and "several other bags which contained kilo size packages" were present in the garage; and information that Georgia police had seized $68,000 in cash from Felix Mejia on October 10, 2005.

In the previous subsection, we concluded that the warrantless entry of police onto the premises of 1001 West Delmas was constitutionally permissible. That being so, it appears that the Defendant would concede the warrant affidavit's sufficiency. To facilitate possible further appellate review, however, we will briefly note our conclusion that the affidavit would be sufficient even if all information gleaned from the warrantless entry was removed, as the Defendant urges. Before that entry, police had learned through their wiretaps that the Defendant expected a substantial delivery of cocaine to 1001 West Delmas at about the time the Pathfinder arrived. In addition, police intercepted a call between the Defendant and Roberts in which the Defendant noted that his "folks" were present, causing Roberts to recommend that they flee from the police. In our view, this information is sufficient to grant a magistrate a substantial basis for concluding that a search warrant would yield evidence of wrongdoing.

## II. Consecutive Sentencing

The Defendant was sentenced on February 19, 2008, and has also filed a Rule 3 appeal as of right challenging the consecutive sentences imposed on him. Although the State does not take issue with the Defendant's inclusion of a sentencing issue, the certified question of law in this appeal is therefore not dispositive of the entire case as required by Tennessee Rule of Criminal Procedure 37(b)(2) because any error at sentencing may require us to modify the Defendant's sentence or remand for resentencing. Nevertheless, in the interest of judicial efficiency and to facilitate possible further appellate review, we will address the sentencing issue raised in the Defendant's brief.

The Defendant contends that the trial court erred in ordering him to serve each of his sentences consecutively to the others, resulting in an effective sentence of ninety-three years in the Department of Correction. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. *See* Tenn. Code Ann. § 40–35–401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn.2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn.Code Ann. § 40–35–401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Pettus*, 986 S.W.2d 540, 543–44 (Tenn.1999); *see also State v. Carter*, 254 S.W.3d 335, 344–45 (Tenn.2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991); *see also Carter*, 254 S.W.3d at 344–45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40–35–113 and 40–35–114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn.Code Ann. § 40–35–210(b); *see also Carter,* 254 S.W.3d at 343; *State v. Imfeld,* 70 S.W.3d 698, 704 (Tenn.2002).

The presentence report in this case reflects that the Defendant was forty-one and unmarried at the time of sentencing. He has three sons and one daughter. He completed high school in 1984 and received computer training at Nashville Tech thereafter. The Defendant has a history of drug abuse, but he is in good mental and physical condition. He reported being self-employed for twenty years as a barber and car salesman. He also reported doing some work in the music industry. The Defendant's criminal history includes eight misdemeanors from 1988 to 1998. It also includes one 2002 federal felony conviction for conspiracy to commit a drug offense, for which the Defendant was in part sentenced to conditional release. He was convicted of violating the terms of that release in 2006.

The Defendant contends that the trial court improperly ordered him to serve his sentences consecutively, initially arguing that imposition of consecutive sentences using facts not found by a jury or admitted by a defendant violates the right to a jury trial guaranteed by the Sixth Amendment to the United States Constitution. *See Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). Our supreme court has recently concluded, however, that Tennessee's consecutive sentencing scheme does not violate *Apprendi,* noting that

'[t]he court's decision to require that separate sentences be served consecutively in no way increases the penalties for the individual crimes.... Consecutive sentences are separate punishments for different offenses, and two sentences do not become a single sentence by virtue of their running consecutively. Thus, the principles underlying *Apprendi* do not apply to consecutive sentences because a judge's decision on how two separate sentences for two distinct crimes shall be served is entirely different from the jury's determination of whether the elements of a crime, necessary for a particular sentence for that crime, have been committed.'

*State v. Allen,* 259 S.W.3d 671, 688–89 (Tenn.2008) (quoting *State v. Keene,* 927 A.2d 398, 407–08 (Me.2007)).

■ Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *See State v. James,* 688 S.W.2d 463, 465 (Tenn.Crim.App.1984). Tennessee Code Annotated section 40–35–115(b) lists a number of findings that will support the imposition of consecutive sentencing. The trial court in this case ordered consecutive sentencing based on its findings that the Defendant is a "professional criminal who has knowingly devoted

[his] life to criminal acts as a major source of livelihood," an "offender whose record of criminal activity is extensive," and was on probation at the time of his offenses. *See* Tenn.Code. Ann. § 40–35–115(b)(1), (2), (6). After a lengthy sentencing hearing, the trial court offered the following rationale for its order of consecutive sentences:

> Let's look at the professional criminal statute. [Defense counsel] argues, well, you know, there's really just a supposition by the officers. I would say there's more than supposition. If you combine the following things, that is, if you look at the federal charges in this case that have been introduced ... it talks about within the report that his basis for the offense back in ... 2001—and oh, by the way, he was arrested at that time with for possession of a forty-five caliber handgun with a fully loaded clip. As it turns out he was arrested by Sergeant McWright. The whole indictment was for sixty kilograms of cocaine, but the report talks about at least two kilograms brought in ... directly to [the Defendant] into the airport from San Diego, California. And then that was on October of '99. And then November the 9th of '99 he had kilograms of cocaine brought to him. So we're talking about in 1999 he's dealing in large amounts of cocaine for which he is indicted and serves time in federal custody. And as soon as he gets out, here we are. We have the wiretap information, which though some people may put a spin on it, when you listen to all of those wiretaps and read what is said, combine that with the observations of the officers, combine that with the fact of the different locations and the different places that [the Defendant] is staying—he's supposed to be staying with his father because that's where he's on release, but

> yet he has these apartments various places. The records that we have seen from Sergeant McWright, the job or lack thereof when there's really no proof even in the presentence report, the search warrants, and the amount of cocaine and money found at the time of this arrest is just overwhelming that he is a professional criminal who has devoted his life to being a criminal as a major source of income. I mean, we are talking massive amounts of money and cocaine. So he does fall within that category. He is also an offender whose record of criminal activity is extensive. I mean, just within this case alone—I mean, his whole life is selling cocaine and bringing cocaine into this community and putting the money—I mean, he's obviously involved in rap music and likes it, but he's funding that via his drug deals. And he was on supervised release probation from federal authorities at the time of the offense. So I am going to find that he does meet the criteria for consecutive sentences in this case. There's *no question about it.*

The Defendant objects to his consecutive sentences by noting that his many co-defendants received substantially less severe sentences, ranging from two years of probation to twenty-two years to serve. He argues that this evidences a violation of the principle that our sentencing laws shall provide "fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." Tenn.Code Ann. § 40–35–102(2). The Defendant, however, cites no authority authorizing us to modify his sentence solely on this basis, nor does the record contain sufficient information about his co-defendants to allow us to review any allegedly unjustified disparity even if we

were authorized to do so. After reviewing the record and the transcript of the Defendant's sentencing hearing, we conclude that the trial court considered the principles of sentencing, as well as all relevant facts and circumstances, and made a sentencing decision within its discretion. This issue is without merit.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the Defendant's convictions and sentences.