# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 23, 2013 at Knoxville

## DARRYL JEROME MOORE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
No. 2006-B-1688    Cheryl Blackburn, Judge

No. M2012-01707-CCA-R3-PC - Filed August 28, 2013

The Petitioner, Darryl Jerome Moore, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his guilty pleas to conspiracy to deliver 300 grams or more of cocaine, possession with intent to deliver 300 grams or more of cocaine, conspiracy to deliver 300 pounds or more of marijuana, money laundering, possession with intent to deliver ten pounds or more of marijuana, and unlawful possession of a weapon after having been convicted previously of a felony drug offense, and his resulting effective sentence of ninety-three years in confinement. On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel and that he pled guilty unknowingly and involuntarily. Based upon the record and the parties' briefs, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

David G. Hirshberg, Nashville, Tennessee, for the appellant, Darryl Jerome Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In June 2006, the Davidson County Grand Jury indicted the Petitioner and numerous co-defendants, including his father, James Moore, for offenses related to the discovery of

weapons and drugs at his father's home. The Petitioner filed a motion to suppress electronic surveillance evidence and a motion to suppress evidence seized from the home, which the trial court denied. Subsequently, the Petitioner pled guilty to conspiracy to deliver 300 grams or more of cocaine, possession with intent to deliver 300 grams or more of cocaine, and conspiracy to deliver 300 pounds or more of marijuana, Class A felonies; money laundering, a Class B felony; possession with intent to deliver ten pounds or more of marijuana, a Class D felony; and unlawful possession of a weapon after having been previously convicted of a felony drug offense, a Class E felony.

We glean the following relevant facts from this court's opinion of the Petitioner's direct appeal of his convictions: In 2005, investigators from the Twentieth Judicial District Drug Task Force began wiretapping cellular telephones belonging to the Petitioner and some of his co-defendants. State v. Moore, 309 S.W.3d 512, 517 (Tenn. Crim. App. 2009). Based on calls intercepted from the Petitioner's telephone, police officers set up surveillance of his father's home on April 1, 2006. Id. at 519. During the surveillance, the officers saw a Nissan Pathfinder enter the driveway and pull into a detached garage behind the house. Id. The garage door closed behind it. Id. Shortly thereafter, the officers intercepted a call to the Petitioner from one of his "associates," alerting him to the officers' presence. Id. at 519-20. Fearing that drug evidence would be destroyed, the officers immediately secured the property and the Petitioner's father, who retrieved a garage door opener for the detached garage. Id. at 521. The officers pressed the opener two or three times, but the garage door would not go up more than a few feet before going back down. Id. The officers kicked open a walk-through door in the garage, and the Petitioner came outside, got onto the ground, and was arrested. Id. The officers also arrested two co-defendants who had been in the garage with the Petitioner. Id. A search of the garage revealed a loaded twenty-gauge shotgun, a loaded handgun, about 100 pounds of cocaine, and about 100 pounds of marijuana. Id. The officers did not find any drugs inside the home but found nearly $150,000 in cash. Id. & n.2.

As part of the plea agreement, the Petitioner reserved a certified question of law challenging the trial court's denial of his motions to suppress evidence. After a sentencing hearing, the trial court sentenced him as a Range I, standard offender to the maximum punishment in the range for each conviction. The trial court ordered that he serve the sentences consecutively based upon his being a professional criminal, having an extensive criminal history, and being on probation at the time of the crimes, resulting in an effective sentence of ninety-three years. Id. at 533-34 (citing Tenn. Code Ann. § 40-35-115(b)(1), (2), (6)). On appeal to this court, the Petitioner raised numerous issues regarding his motions to suppress evidence and argued that the trial court erred by ordering consecutive sentencing. Id. at 516-17. This court affirmed the Petitioner's convictions and sentences. Id. at 535.

The Petitioner filed a timely petition for post-conviction relief, arguing that he

received the ineffective assistance of trial counsel. The post-conviction court appointed counsel, and counsel filed an amended petition, arguing that the Petitioner received the ineffective assistance of counsel because trial counsel failed to request a Franks hearing, failed to subpoena witnesses to the sentencing hearing in order to show that the Petitioner was not a professional criminal, and argued that consecutive sentencing was improper under State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), and Washington v. Blakely, 542 U.S. 296 (2004), when those cases were "simply not on point." Finally, the Petitioner claimed that he pled guilty unknowingly and involuntarily.

At the evidentiary hearing, lead counsel testified that he had been practicing law for twenty-six years, working as a prosecutor for four years and as a criminal defense attorney for twenty-two years. In 2006, the Petitioner retained lead counsel in this case. The case involved a ten-count indictment with multiple co-defendants. Lead counsel said that he did not have "extensive experience in wiretap cases," that another attorney was working with him on an additional wiretapping case, and that he "enlisted" her to help him with this case. Lead counsel and co-counsel met with the Petitioner. Lead counsel said that the Petitioner probably was the most intelligent client he had ever represented, that the Petitioner asked co-counsel some "very pointed and direct questions," and that the Petitioner decided to hire co-counsel. Lead counsel said co-counsel was to "handle the wiretap issues" while he handled the suppression issues related to the search of the Petitioner's father's home and "any other part of the case."

Lead counsel testified that he met with the Petitioner more than twenty times, not including court appearances. He said that when the trial court denied the Petitioner's motions to suppress, he told the Petitioner that "our chances of winning the case at trial were close to zero and that this was not a case that if we tried we had a chance to win." He said that the State never made a plea offer with "a finite number of years" but that the State offered for the Petitioner to "plead open." In exchange for the Petitioner's guilty pleas, the State would dismiss the case against his father and allow the Petitioner to reserve a certified question of law. The State also made a plea offer to the Petitioner's father, which was contingent upon the Petitioner's accepting the Petitioner's plea offer. Lead counsel said that he met with the Petitioner and that the Petitioner "was apprised of how his plea would impact his father." Erik Herbert, counsel for the Petitioner's father, may have been present during the meeting, but lead counsel could not remember. Lead counsel said that if the Petitioner had turned down the State's offer, the Petitioner's father "would have been sitting next to us at trial." Lead counsel said that the State never should have charged the Petitioner's father and that it would have been a "travesty" for the Petitioner's father to have been convicted of a crime.

Lead counsel testified that he gave the Petitioner "all the paperwork out of this case," and he acknowledged that he was familiar with a Franks hearing. Lead counsel did not see

any reckless or misleading statements in the wiretap applications that would have warranted a Franks hearing. He said that if the Petitioner had asked him to subpoena the Petitioner's federal probation officer, Ed Towe, to the sentencing hearing, he would have done so. However, lead counsel said he would have been "extremely reluctant" to call Towe as a witness because Towe "would have taken that opportunity to do whatever he could to have painted [the Petitioner] in a bad light." He said Towe was "not someone who will accentuate the positive. He will accentuate the negative." Lead counsel had a couple of witnesses testify at the sentencing hearing about the Petitioner's good character. Lead counsel said that "Gomez was my case" and that he argued Gomez and Blakely at the sentencing hearing.

On cross-examination, lead counsel testified that at the time of the plea negotiations, the Petitioner's father's home was the subject of a federal civil forfeiture. The Petitioner had copies of all of the wiretap applications and never told lead counsel that the applications contained false statements. Upon being questioned by the post-conviction court, lead counsel acknowledged that he argued against consecutive sentencing. Lead counsel told the post-conviction court, "No offense, Judge, but taking a Range 1 person and maxing them out and giving them all consecutive time, I think that was too harsh." Lead counsel appealed the Petitioner's case to the state supreme court and appealed the wiretapping issues to the United States Supreme Court. However, both courts refused to consider the case.

The Petitioner testified that he was indicted in June 2006 and that he and lead counsel discussed the indictments. The Petitioner consented to lead counsel's hiring co-counsel because co-counsel had specialized knowledge about wiretaps. The Petitioner and lead counsel discussed the defense's strategy, and the Petitioner was prepared to go to trial. The Petitioner said that the State made an offer with "open sentencing" and that he refused to accept the offer. Three days before the Petitioner's scheduled trial, lead counsel and Erik Herbert, who was representing the Petitioner's father, visited the Petitioner in jail. Herbert told the Petitioner that there was a two percent chance the jury would convict his father. The Petitioner said Herbert also told him that his father "seemed to be stressed out really bad about the trial, he wasn't feeling well and so on and so forth." The Petitioner said he "perceived" Herbert to be telling him that his father was "sickly." He said that he loved his father with all of his heart, that he was not allowed to contact his father, and that "the main thing to me was that even if I had to face ninety-three years it wasn't worth my father going through it." He immediately decided to accept the State's plea offer. After the trial court sentenced the Petitioner, the Petitioner's father visited him, and the Petitioner learned his father had not been sick. He said that he was misled about his father's condition and that he entered his pleas based on what he was told.

The Petitioner testified that lead counsel and co-counsel never discussed a Franks hearing with him. The Petitioner later learned that counsel should have requested a hearing.

He said that he had standing to challenge the wiretap of two telephones and that a <u>Franks</u> hearing was necessary because counsel could have used omissions in the wiretap applications to show "the requisite necessity falls short." Lead counsel should have called the Petitioner's accountant, Sam Mansour, to testify at his sentencing hearing. Mansour possessed the Petitioner's income tax files, could have established a work history for the Petitioner, and could have shown that the Petitioner was not a professional criminal. Lead counsel told the Petitioner that he talked with Mansour but that Mansour no longer had the Petitioner's income tax records. Lead counsel argued at sentencing that <u>Blakely</u> prohibited consecutive sentences, but the trial court told counsel that <u>Blakely</u> did not apply. The Petitioner said other "prevailing cases" were available that lead counsel could have argued regarding the Petitioner's being a professional criminal or having an extensive criminal history. The Petitioner said lead counsel "got so carried away with the Blakely fix" that he never used "the other prevailing cases."

On cross-examination, the Petitioner testified that Herbert told him that his father was not feeling well, was stressed, and had high blood pressure. Herbert claimed the Petitioner's father "was really not up to standing trial." After hearing about his father's health, the Petitioner pled guilty so that the State would release his father. The Petitioner assumed that the State also would dismiss the forfeiture action against his father's home. He said that he could have shown at trial that he was not guilty of all six counts. The State asked him to describe the defenses he would have used at trial, and he answered, "I don't know." He said that from 1994 to 1999, he owned three businesses and that his accountant did his "book work." Thus, his accountant could have established that he was not a professional criminal. The Petitioner's federal probation officer also could have testified that the Petitioner was employed by Carl Black Chevrolet and that the Petitioner worked from his studio at home.

Co-counsel testified that the Petitioner was very intelligent and was very interested in his case. She said that her representation of him was limited to "litigating the suppression motion on the wiretap" and that she was "pretty much out of the case" by the time of the plea negotiations. However, she helped prepare some paperwork related to reserving the certified question of law. If the Petitioner had not pled guilty, co-counsel would not have participated in his trial. On cross-examination, co-counsel testified that although she had not interviewed Ed Towe and did not know specifically what he would say about the Petitioner, she had known Towe "long enough and have been a defense lawyer long enough to know I would be loathe to call Mr. Towe."

Erik Regis Herbert testified that he represented the Petitioner's father and met with the Petitioner in jail one time. The Petitioner's lead counsel also was present. The Petitioner's father had received a plea offer from the State, and the offer was contingent upon the Petitioner's accepting the Petitioner's plea offer. The meeting occurred a few days before

the trial was scheduled to begin, and the purpose of the meeting was to talk with the Petitioner about his father's offer. The Petitioner's father wanted to accept the State's offer, but Herbert was prepared to try the case. He said that "the whole criminal experience had been very draining on [the Petitioner's father]" and that the Petitioner's father was "very stressed."

On cross-examination, Herbert testified that the Petitioner was concerned about his father and asked Herbert about his father's plea offer. Herbert told the Petitioner that his father wanted to accept the offer, which included dismissing the civil action for forfeiture of his father's home. Herbert's meeting with the Petitioner was brief, and Herbert did not give the Petitioner any false or incorrect information.

James Earl Moore, the Petitioner's father, testified that he pled guilty in exchange for probation and the opportunity to have his conviction expunged.[1] He said that neither his counsel nor the Petitioner's counsel asked for his permission to visit the Petitioner and that he learned about their meeting with the Petitioner about one and one-half years after the meeting. He said he was worried about his case but "not to the point where I was sick or stressed out or anything like that." He never visited his physician as a result of this case and was surprised to learn about counsels' meeting with the Petitioner. Mr. Moore said that he had wanted the Petitioner to do what was best for the Petitioner and that the decision about whether to go to trial was the Petitioner's decision. If going to trial would have been best for the Petitioner, then Mr. Moore also would have gone to trial.

The State recalled lead counsel as its only witness. Lead counsel testified that he and Erik Herbert met with the Petitioner so that the Petitioner could talk directly with Herbert about his father's plea offer. Lead counsel said he did not suggest to the Petitioner that he plead guilty but let him know the terms of his offer "which was not really an offer to [the Petitioner] so much as an offer to [the Petitioner's] father." Lead counsel said he and Herbert talked with the Petitioner about his father's "civil exposure" and "the stress of going through a trial." At the conclusion of the meeting, the Petitioner indicated that he wanted to plead guilty. Lead counsel said that the Petitioner's "motivation . . . was completely to make sure that his dad was protected." Regarding the Petitioner's cocaine and conspiracy to possess cocaine charges, the Petitioner did not have any defenses. As to the marijuana charges, the

---

[1]According to the Petitioner's and James Moore's guilty plea hearing transcript, James Moore was charged with conspiracy to deliver 300 grams or more of cocaine, possession with intent to deliver 300 grams or more of cocaine, conspiracy to deliver 300 pounds or more of marijuana, money laundering, and possession with intent to deliver ten pounds or more of marijuana. He pled guilty to one count of facilitation to possess more than one-half gram of cocaine, a Class C felony, and received a three-year sentence to be served on probation.

marijuana had been in the garage for an extended period of time. Therefore, a question existed as to whether the Petitioner ever owned or possessed the marijuana. Lead counsel thought he also could have contested the weapons charges. He said that the likelihood of the jury's convicting the Petitioner of money laundering was "nearly one hundred percent."

On cross-examination, lead counsel acknowledged that he and Herbert met with the Petitioner for forty-five minutes. Herbert attended the meeting in case the Petitioner had specific questions about his father's plea offer.

In a written order, the post-conviction court denied the petition for post-conviction relief. As to the Petitioner's claim that counsel should have requested a Franks hearing, the post-conviction court noted that lead counsel said he saw no basis for requesting a hearing and that the Petitioner failed to cite any misstatements or omissions in the wiretap applications that would have warranted a hearing. Regarding the Petitioner's claim that lead counsel was ineffective for failing to rely on cases other than Blakely at sentencing, the post-conviction court stated that the Petitioner failed to explain what arguments lead counsel should have made at sentencing and that the Petitioner failed to cite any cases supporting his argument against consecutive sentencing. As to the Petitioner's claim that lead counsel was ineffective for failing to have the Petitioner's accountant testify at sentencing, the court found that lead counsel spoke with the accountant and that the Petitioner's tax records were no longer available. Regarding lead counsel's failure to have the Petitioner's probation officer testify, the court specifically accredited counsel's testimony that the officer would not have testified favorably for the Petitioner. The court also noted that both witnesses failed to testify at the evidentiary hearing. Thus, the court concluded that the Petitioner failed to show he received the ineffective assistance of counsel.

Regarding the Petitioner's claim that he did not plead guilty knowingly and voluntarily, the court accredited the testimony of lead counsel and Erik Herbert, who said that they met with the Petitioner to explain his father's offer and that they did not give the Petitioner any false information. The court stated that although the Petitioner thought the attorneys misled him about his father's health, the Petitioner admitted that he would have gone to prison to help his father. The court also stated that it had reviewed the Petitioner's guilty plea hearing transcript, that the Petitioner denied at the hearing that he was pressured to plead guilty, and that the Petitioner never claimed at the hearing that he was pleading guilty only because of his father's poor health. The post-conviction court concluded that the Petitioner failed to show he pled guilty unknowingly and involuntarily.

## II. Analysis

On appeal, the Petitioner maintains that he received the ineffective assistance of

counsel and that he did not plead guilty knowingly and voluntarily. The State responds that the post-conviction court properly denied the petition for post-conviction relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Moreover, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether a petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

On appeal, the Petitioner argues that trial counsel, particularly co-counsel, were ineffective for failing to request a Franks hearing in order to argue the "necessity requirement." In Franks v. Delaware, 438 U.S. 154, 171 (1978), the United States Supreme Court held that an attack on a facially valid search warrant requires that a defendant make "allegations of deliberate falsehood or of reckless disregard for truth, and those allegations must be accompanied by an offer of proof." However, the post-conviction court specifically accredited lead counsel's testimony that a Franks hearing was not warranted in this case. Moreover, as noted by the post-conviction court in its order denying relief, the Petitioner failed to cite to a single incident of deliberate falsehood or reckless disregard for the truth in the wiretap applications. Therefore, he is not entitled to post-conviction relief.

-9-

The Petitioner also maintains that lead counsel was ineffective for failing to call the Petitioner's accountant, Sam Mansour, and his federal probation officer, Ed Towe, as witnesses at his sentencing hearing in order to show that he was not a professional criminal. However, the post-conviction court accredited lead counsel's claims that neither witness would have been helpful to the Petitioner at sentencing. In any event, neither witness testified at the evidentiary hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As this court has repeatedly warned, we may not speculate on what benefit the witnesses might have offered to the Petitioner's case.

The Petitioner also contends that lead counsel was ineffective for failing to argue cases other than Gomez and Blakely at sentencing. However, the post-conviction court denied relief on this issue because the Petitioner failed to "indicate what arguments his counsel should have made instead, or what case law would have been persuasive to justify a lesser sentence." Likewise, the Petitioner has failed to explain to this court what cases counsel should have relied on in counsel's argument against consecutive sentencing. We note that in addition to finding the Petitioner to be a professional criminal with an extensive criminal history, the trial court ordered consecutive sentencing because the Petitioner was on probation when he committed the crimes in this case. That factor alone would have justified the trial court's decision to order consecutive sentencing. Therefore, the Petitioner has failed to show that counsel rendered deficient performance or that he was prejudiced by any deficiency.

Finally, as to the Petitioner's claim that he pled guilty unknowingly and involuntarily because lead counsel lied to him about his father's condition, the Petitioner acknowledged at the evidentiary hearing that he was concerned about his father and that he wanted to protect his father from going to trial. In addition to the State's agreeing that the Petitioner's father should receive probation, the record reflects that the State dismissed the civil forfeiture proceeding against his father's home. Moreover, like the post-conviction court, we have reviewed the transcript from the guilty plea hearing in which the Petitioner and his father pled guilty. During the hearing, the trial court thoroughly questioned the Petitioner and his father about their guilty pleas. The Petitioner stated that he had reviewed the terms of the guilty pleas with lead counsel, that he was pleading guilty voluntarily, and that he was satisfied with trial counsel's performance. The trial court outlined the terms of the Petitioner's guilty pleas and his father's guilty plea, stating that his father was getting "a once in a lifetime opportunity" to plead to one lesser-included offense. We agree with the post-conviction court that the Petitioner has failed to show that he pled guilty unknowingly and involuntarily.

-10-

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE